**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------- x

In re:                                                    :
                                                          :      Chapter 11 Case No. 09-13412 (MG)
Metaldyne Corporation, et al.,                            :
                                                          :
        Debtors.                                  :
                                                          :      Jointly Administered
                                                          :
                                                          :
-------------------------------------------------------- x

BDC FINANCE, L.L.C.                                        :
                                                          :      Dist. Ct. Case No. 09-cv-07897-DLC
        Appellant,                                :
                                                          :
    v.                                              :
                                                          :
METALDYNE CORPORATION, et al., MD                         :
INVESTORS CORPORATION                                     :
                                                          :
        Appellees.                                :

## AMENDED BRIEF OF APPELLANT BDC FINANCE, L.L.C.

**BINGHAM McCUTCHEN LLP**
Steven Wilamowsky
Cassandra Aquart
399 Park Avenue
New York, NY 10022
Telephone: (212) 705-7000

-and-

Sabin Willett
Rheba Rutkowski
One Federal Street
Boston, MA 02110
Telephone: (617) 951-8000

*Counsel to BDC Finance, L.L.C.*

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................. 1

JURISDICTION ................................................................................... 2

STATEMENT OF THE ISSUES............................................................. 2

STATEMENT OF THE CASE................................................................ 3

    A.    Black Diamond ................................................................. 3

    B.    The Bidding Procedures..................................................... 3

    C.    The Auction .................................................................... 4

    D.    The Impairments Of Black Diamond's Rights ..................... 7

    E.    The Sale Hearing And Orders ............................................ 9

STANDARD OF REVIEW ..................................................................... 10

SUMMARY OF ARGUMENT ................................................................ 10

ARGUMENT ....................................................................................... 11

    A.    Section 363 Of The Bankruptcy Code Does Not Authorize The Sale................. 11

        1.    The law of credit bidding ........................................ 11

        2.    The bankruptcy court erred in withholding adequate protection ............ 13

        3.    The bankruptcy court erred in ruling that Section 363(k) of the Bankruptcy Code authorized the sale ........................................ 14

    B.    Black Diamond Did Not Consent To The Newco Bid Or The Sale Order.......... 16

        1.    The Loan Documents do not authorize the Sponsors to conduct a credit bid without each creditor's consent ............................... 16

        2.    The Loan Documents did not authorize the Sponsors to "credit bid" through Newco ..................................... 17

    C.    The Sale Order Is An Impermissible Sub Rosa Plan ........................................... 19

    D.    The Newco Bid Violates The Good-Faith Requirement Of Section 363(m)....... 20

    E.    The Bankruptcy Court's Orders Violated Black Diamond's Constitutional Rights ............................................................ 21

    F.    The Remedy Is Payment In Full Of Black Diamond's Secured Claim .............. 22

CONCLUSION.................................................................................... 23

ADDENDUM OF RELEVANT STATUTORY TEXT

# TABLE OF AUTHORITIES

## CASES

*Butner v. United States*, 440 U.S. 48 (1979)....................................................................14

*Cohen v. KB Mezzannie Fund II (In re SubMicron Sys. Corp.)*, 432 F.3d 448 (3d Cir. 2006) ..................................................................................................................23

*Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063 (2d Cir. 1983) ...........................................................................................10, 19

*Contrarian Funds, LLC. v. WestPoint Stevens, Inc. (In re WestPoint Stevens, Inc.)*, 333 B.R. 30 (S.D.N.Y. 2005) ....................................................................13, 15

*Dewsnup v. Timm*, 502 U.S. 410 (1992) .........................................................................22

*In re General Motors Corp.*, 407 B.R. 463 (Bankr. S.D.N.Y. 2009) ...............................20

*In re GWLS Holdings, Inc.*, No. 08-12430, 2009 WL. 453110 (Bankr. D. Del. Feb. 23, 2009) .......................................................................................................9, 18

*Indiana State Police Pension Trust v. Chrysler LLC (In re Chrysler LLC)*, 576 F.3d 108 (2d Cir. 2009).............................................................................1, 18, 20

*Lewis v. Manufacturers Nat'l Bank*, 364 U.S. 603 (1961) ..............................................14

*Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555 (1935) .................................22

*Metromedia Fiber Network Servs. v. Lexent, Inc. (In re Metromedia Fiber Network, Inc.)*, 290 B.R. 487 (Bankr. S.D.N.Y. 2003).........................................13, 14

*Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452 (2d Cir. 2007)...........................................................19

*Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306 (1950) .............................21

*Official Comm. of Unsecured Creditors of LTV Aerospace & Defense Co. v. LTV Corp. (In re Chateaugay Corp.)*, 973 F.2d 141 (2d Cir. 1992) ...................................10

*Pension Benefit Guaranty Corp. v. Braniff Airways, Inc. (In re Braniff Airways, Inc.)*, 700 F.2d 935 (5th Cir. 1983) ..............................................................................19

*Schwartz v. Aquatic Dev. Group, Inc. (In re Aquatic Dev. Group, Inc.)*, 352 F.3d 671 (2d Cir. 2003).........................................................................................................10

i

*Travelers Life & Annuity Co. v. Ritz-Carlton of D.C., Inc. (In re Ritz-Carlton of D.C., Inc.)*, 98 B.R. 170 (S.D.N.Y. 1989) .......................................................................14

*United States v. Booth Tow Servs., Inc.*, 64 B.R. 539 (W.D. Mo. 1985) .........................14

*United States v. Security Indus. Bank*, 459 U.S. 70 (1982) ............................................22

*Wright v. Union Central Life Ins. Co.*, 304 U.S. 502 (1938) ...........................................22

*Zervos v. Verizon N.Y., Inc.*, 252 F.3d 163 (2d Cir. 2001) ...............................................10

## STATUTES

28 U.S.C. § 157(b)(1) ......................................................................................................2

28 U.S.C. § 158(a) ...........................................................................................................2

28 U.S.C. § 1334 ..............................................................................................................2

11 U.S.C. § 363 ......................................................................................................... *passim*

11 U.S.C. § 363(b) ...............................................................................................2, 12, 20

11 U.S.C. § 363(e) .......................................................................................2, 10, 13, 23

11 U.S.C. § 363(k) ..................................................................................1, 12, 13, 14, 15

11 U.S.C. § 363(m) ...................................................................................................11, 20

U.C.C. §§ 9-610(a)-(c) ....................................................................................................12

U.C.C. § 9-9-615(d) .........................................................................................................12

## TREATISES

4 COLLIER ON BANKRUPTCY, ¶ 506.03[4][a][iii] (15th ed. rev. 2004) ..............................22

**PRELIMINARY STATEMENT**

The financial crisis of 2008-09 has seen a spate of strategic takeovers effected through quick bankruptcy sales under section 363 of the Bankruptcy Code in which non-consenting secured lenders are "dragged along" in a "credit bid" of the prepetition debt for the debtor's assets.  The decision below took that trend to a new and unlawful height.  The bankruptcy court permitted the control group to force not merely the sale itself, but a non-consenting lender secured by the sold collateral to accept equity in a new venture formed by the control group.  No evidence was offered of the value of this new venture or its equity.  The dissident's claims were extinguished, its security interests—even in unsold collateral—were stripped, and it was denied any share of the cash portion of the sale proceeds, some of which was reserved for payoffs to junior constituencies.  All of this was accomplished literally in the dead of night.

Appellant is BDC Finance, L.L.C. ("Black Diamond"), a secured creditor under a prepetition term loan facility of chapter 11 debtors Metaldyne Corporation, *et al.* (collectively, "Metaldyne"), with JPMorgan Chase Bank N.A. as administrative and collateral agent ("Agent").  Black Diamond appeals from the bankruptcy court's order approving the sale of most of Metaldyne's assets and extinguishing Black Diamond's prepetition claims and security interests.  The order approved a bid submitted by MD Investors Corporation ("Newco"), an investment vehicle formed by two hedge funds that also were prepetition term lenders—The Carlyle Group and Solus Investment Funds (the "Sponsors").  The bid purported to be a "credit bid" under section 363(k) of the Bankruptcy Code—in the full amount of the prepetition secured debt obligations (not less than $425 million), for less than all of the collateral, and for the purpose of topping a cash bid of approximately $125 million.  But this was an auction in name only.  In reality, it was a private M&A negotiation between the Sponsors and junior creditor constituencies, a process intended to kill off the cash auction.

After *Indiana State Police Pension Trust v. Chrysler LLC (In re Chrysler LLC)*, 576 F.3d 108 (2d Cir. 2009), there is little doubt that the bankruptcy court has broad discretion to permit

1

an asset sale.  But *Chrysler* presented the simple question of whether assets could be sold to a buyer in exchange for proceeds left at the estate to be distributed according to bankruptcy priorities.  In this case, the sale proceeds are not to be distributed at all, but lodged in a new company whose ownership, control, capitalization, and value were never disclosed to the bankruptcy court, and in which the control group was given license to create whatever capital structure it wanted, and distribute to secured creditors equity shares in what amounted to a black box.  Far from the "indubitable equivalent" that sections 361 and 363(e) of the Bankruptcy Code require as adequate protection for the loss of property rights, Black Diamond was left with only the right to an equity share in a new venture of unknown capitalization or value.  No case has yet held that in a bankruptcy sale, the court may force a secured creditor to surrender its secured claim in exchange for equity in a new, undescribed venture.

This Court should reverse that portion of the sale order that extinguished Black Diamond's claim and security interests, and order that its claim be reinstated, with liens and security interests to attach to the proceeds of the sale.  Because Black Diamond's claim is small and may be satisfied in full from the cash proceeds if the sale closes, the Court need not unwind the transfer of assets to grant complete relief.

## JURISDICTION

The bankruptcy court had jurisdiction under 28 U.S.C. § 157(b)(1).  It issued its oral order denying Black Diamond's Emergency Motion to Adjourn Sale Hearing ("Emergency Motion") on August 7, 2009, and its written sale order ("Sale Order") and accompanying opinion ("Sale Opinion") on August 12, 2009.  Black Diamond appealed from both orders on August 19, 2009.  This Court has jurisdiction under 28 U.S.C. §§ 158(a) and 1334.

## STATEMENT OF THE ISSUES

1.     Whether the bankruptcy court erred in approving a sale of assets under section 363(b), where (a) the claims and security interests of Black Diamond in those assets were extinguished over its objection, in exchange for equity shares in a new venture as to whose

structure and value no evidence was offered; (b) the Sale Order was premised on a "credit bid" in the amount of the entire secured debt, together with cash payments; (c) the secured debt exceeded by more than $300 million the high cash bids generated at the auction; (d) the cash payments were reserved for junior bankruptcy constituencies, with no cash payment in respect of Black Diamond's claim; (e) claims and security interests of non-consenting secured creditors in unsold collateral were released; and (f) none of the foregoing terms was disclosed until 10:00 p.m. on the night before the sale was approved.

2.　　Whether the bankruptcy court erred in ruling that Black Diamond consented to the terms of the sale through the terms of the prepetition loan documents ("Loan Documents").

3.　　Whether the Sale Order, even if consistent with section 363 of the Bankruptcy Code and the Loan Documents, constitutes an impermissible *sub rosa* plan of reorganization.

4.　　Whether the bankruptcy court's orders violated Black Diamond's constitutional rights.

STATEMENT OF THE CASE

**A.　Black Diamond**

Black Diamond is a holder of approximately $3.5 million of the $400 million in outstanding principal debt under a Credit Agreement between Metaldyne Intermediate Holdco, Inc., Metaldyne Company, LLC, as borrowers, and certain prepetition lenders. *See* App.1160-1275 (Credit Agreement) (Sale Hrg. Ex. MDI-1). The obligations to Black Diamond were secured by security interests in substantially all of Metaldyne's assets, granted in that certain Security Agreement dated as of January 11, 2007. *See* App.1276-1321 (Security Agreement) (Sale Hrg. Ex. MDI-2).

**B.　The Bidding Procedures**

The Metaldyne debtors filed their chapter 11 cases on May 27, 2009. They argued that a quick sale of these assets was necessary to satisfy conditions imposed by post-petition lenders

Ford Motor Company, General Motors Corporation, and Chrysler Group L.L.C.  *See* App.1415 (August 7, 2009 Declaration of Michael Macakanja ¶¶ 11-12) (Sale Hrg. Ex. ECF 637)[1].

In June and July, 2009, the bankruptcy court approved bidding procedures for the sales of the assets of Metaldyne's Powertrain (App.405-436 (Powertrain Sale Order)), amended by App.592-605 (Amended Powertrain Sale Order)) and Chassis divisions (App.562-591 (Chassis Sale Order)).  Metaldyne proffered cash "stalking horse" bids, with no provision for release of liens on unsold collateral, carveouts for junior interests, or requirement that secured creditors invest in a new venture to recover proceeds.  *See* App.1419, 1421 (Macakanja Decl. ¶ 25, 31) (Hephaestus and Revstone bids).  On July 31, 2009, Metaldyne received a bid from Newco for the Powertrain, Chassis, BSM, and Tubular Assets, comprising substantially all of Metaldyne's assets (the "Newco Bid").  App.1420 (Macakanja Decl. ¶ 26).  The Newco Bid terms were not disclosed to Black Diamond until late evening on August 6, 2009, and were not filed with the bankruptcy court until the morning of August 7, 2009.

## C.     The Auction

Metaldyne commenced an auction ("Auction") for the Powertrain and Chassis Assets on August 5, 2009.  The Auction lasted approximately 26 hours (from 11 a.m. August 5 to 2 a.m. August 6, and from 11 a.m. to 9:30 p.m. on August 6).  *See* App.1322-1353 (Day 1 Auction Tr.); App.1354-1379 (Day 2 Auction Tr.) (Sale Hrg. Exs. 1 & 2).  Little of that time involved actual bidding, and what began as an auction devolved on the second day to a long, closed-door negotiation with the Creditors Committee.  *See generally*, App.1001, 1017 (Sale Hrg. Tr. 20:11-14; 32:6-11).[2]  Although the Auction transcript does not reflect the time periods for discussions held on and off the record, the miniscule size of the transcript itself demonstrates that almost all of these 26 hours were spent behind closed doors.  The transcript is a mere 58 pages, roughly the

---

[1] The necessity was entirely pretextual.  The post-petition lenders were all original equipment manufacturers who depended vitally on uninterrupted supply from Metaldyne, and in no position to exercise remedies for default.  App.1034-35 (Sale Hrg. Tr. 53:15-54:2).

[2] Black Diamond's counsel was not permitted to participate in these negotiations.

equivalent of a 90-minute deposition (which would translate to roughly 23.5 hours behind closed doors).

From those closed-door discussions and negotiations emerged a bid more beneficial to junior constituents than to a secured lender; a bid that included $2.5 million in cash to a liquidation trust, a release of liens on any assets not included in the sale, and the assumption of $8.5 million in administrative claims. App.1056-57 (Sale Hrg. Tr. 75:24-76:5) (Kell: "I believe that any ambiguities with regard to administrative expenses and payments thereof were removed. And I think that it was important that the [Creditors Committee] received as good a treatment as possible."). None of this was discussed on the record at the Auction. The record was merely a recitation of the agreed-upon terms. So irrelevant to this negotiation was asset value that some of Metaldyne's investment bankers—who were most knowledgeable about the asset values— were absent. *See* App.1040-41 (Sale Hrg. Tr. 59:4-17; 60:12-22).

At the outset, Metaldyne explained that it had two qualified bidders for the Powertrain Assets—HHI and Ares—in addition to the "global bid" from Newco, which Metaldyne described as a consortium of the Lenders led by Carlyle and Solus. *See* App.1326-27 (Day 1 Auction Tr. 6:1-7:25); App.967-68 (Sale Opinion at 2-3). An Ares bid of $94.5 million became the Auction baseline bid for the Powertrain Assets. App.1334 (Day 1 Auction Tr. 16:6-18). After receiving a series of competing bids from HHI and Ares, Metaldyne stated that the Ares bid of $100 million was the highest, *see* App.1344 (Day 1 Auction Tr. 28:1-8), and announced that it now had value information for each of the four businesses and would return to Newco and determine whether there was a global bid greater than the sum of the values for each business, *see* App.1345 (Day 1 Auction Tr. 29:1-25).

When the Auction recommenced at 11 a.m. on August 6, the Sponsors advised that they would bid the full debt less $25 million, with the $25 million to remain as a claim and lien on assets not being sold (the so-called "RemainCo Assets") pending an agreement with the Creditors Committee. App. 1357-58 (Day 2 Auction Tr. 5:8-6:5). This effectively terminated the auction for any cash bidder because the asset values could never command a cash bid for the

full debt. The balance of August 6 was a closed-door negotiation between the Sponsors, the Debtors, and junior constituencies. The transcript evidences Metaldyne urging the Sponsors and the Creditors Committee to make a deal involving "the forgiveness or release of those liens and the forgiveness of any deficiency claim," App.1359-60 (Day 2 Auction Tr. 8:1-19), and the Creditors Committee indicating progress, App.1360-61 (Day 2 Auction Tr. 9:1-25). None of this had anything to do with valuing the assets.

The aggregate cash bid from a combination of qualified bidders would have resulted in at least $115 million of cash proceeds from the Chassis and Powertrain Assets, additional recoveries of $11-$13.5 million from the later disposition of the smaller divisions, and additional collateral that would have otherwise been left behind in Metaldyne's estates. *See* App.1137-38 (Sale Hrg. Tr. 156:3-157:2).[3] However, no one knows how high the cash bidding might have gone because it was killed by Newco's "credit bid" at the full amount of the debt. Ares, after prevailing at the marathon auction day on August 5, declined to submit a competing bid against Newco. *See* App.1437 (August 7, 2009 Declaration of Michael Kell ¶ 24) (Sale Hrg. Ex. ECF 641); App.1423 (Macakanja ¶ 38).

The Newco Bid, which came to be approved by the bankruptcy court, included: (i) $39.5 million in cash, subject to adjustments; (ii) assumption of $8.5 million in administrative expenses (junior in bankruptcy priority to Black Diamond); (iv) $2.5 million to fund a litigation trust for the Creditors' Committee (also junior); (iii) a credit bid by Newco in the nominal amount of $425 million; (iv) a release of liens and security interests on unsold collateral; and (v) an assumption of a €15,000,000 European note. *See* App.970 (Sale Opinion at 5); App.1424-25 (Macakanja Decl. ¶¶ 39-44). In short, instead of bidding up the cash bids for the assets, the

---

[3] In addition to the $100 million Ares bid for the Powertrain Assets, the Carlyle bid for the Chassis Assets was for $15 million, principally cash. App.1016-17 (Sale Hrg. Tr. 35:18-36:1). There was no auction for the BSM Assets, valued in the range of $8 million to $10.5 million, *see* App.1402 (August 7, 2009 Declaration of Jeremy Lamb ¶ 10) (Sale Hrg. Ex. ECF 633); App.1045 (Sale Hrg. Tr. 64:4-6), or the Tubular Assets, valued in the range of range of $3 million, *see* App.1409 (August 7, 2009 Declaration of Adam Fovenesi ¶ 10) (Sale Hrg. Ex. ECF 634); App.1044-45 (Sale Hrg. Tr. 63:24-64:3).

Sponsors and the Debtors cut them off altogether; instead of distributing proceeds of the sale to the Lenders, the Sponsors forced them to accept an equity share in a new venture, concerning which there was no evidence at trial, while earmarking more than $11 million of cash or credit for junior constituencies, and stripping the Lenders of liens in property left behind.[4]

## D.     The Impairments Of Black Diamond's Rights

Before 10:00 p.m. on August 6, 2009, Black Diamond was never advised that the "auction" would include payments to junior constituencies, nor that some of its collateral would be left behind and released.   Commencing on August 3, 2009, Black Diamond's counsel requested the actual credit bid documents.  *See* App.614-17 (fax and e-mail message attached as Ex. 1 to Emergency Motion).  The Sponsors refused to provide even a copy of the bid.  *See* App.618-619 (e-mail message of James Tecce, Esq., attached as Ex. 2 to Emergency Motion). Metaldyne also refused to provide the relevant documents.  *See* App.620-623 (e-mail correspondence with Richard Engman, Esq., attached as Ex. 3 to Emergency Motion).   On August 5, when the Auction commenced, and again on August 6, when it continued, Black Diamond renewed its requests.  *See id.*

The Purchase Agreement was not disclosed until approximately 10:00 p.m. on August 6, 2009, just eleven hours before the scheduled hearing on the sale motion.  The document was a single-spaced, 74-page draft, including electronic and handwritten markups, but omitting schedules and exhibits.  *See* App.611 (Emergency Motion ¶ 5).  The transaction described in the Purchase Agreement was not simply a bid of secured debt for collateral.   Newco would undertake obligations having nothing to do with a credit bid of collateral, including assuming liabilities, and an elaborate suite of executory obligations and commitments to employees.  *See*

---

[4] In late July, Black Diamond was advised that a new bidding vehicle would be formed by Carlyle and Solus that would be capitalized under arrangements that required new investments and accorded to various investors different levels of rights against Newco (based, *inter alia*, on those investments).  As described, the structure would create various control mechanisms beneficial to the sponsors, according one treatment to Lenders that contributed new cash to the new enterprise, and another to Lenders that did not.  No disclosure was given of any plan to pay junior constituencies such as the Creditors Committee, or to leave behind and release the liens on some of the collateral.

App.1444 (Purchase Agreement § 1.01(c)) (Sale Hrg. Ex. ECF 632). Section 1.02(c) excluded the so-called RemainCo Assets, which include the collateral of Black Diamond.[5] By early dawn, review of the Purchase Agreement suggested something never disclosed in the bid procedures: a new corporation was credit bidding for certain assets, abandoning others, undertaking obligations, acquiring assets and rights that are not collateral at all, mixing all of these rights, liabilities, and obligations into a corporate bundle, reserving distributions for a variety of junior creditors, and limiting secured lenders to participation in a Newco by means of an instrument that was undefined, as was Newco's capital structure and governance.

Prior to the sale hearing, Black Diamond received no other documents material to the sale transaction. At the hearing, the movants offered no evidence of the value Black Diamond would receive as a Newco equity-holder as adequate protection for the elimination of its secured claim. *See*, *e.g.*, App.1123-26 (Sale Hrg. Tr. 142:24-145:14 (Metaldyne's counsel responding to the court's distinction of the *Chrysler* case on the ground that the secured creditors in *Chrysler* "were all assured of getting their pro rata share of 2 billion dollars. . . . [a]nd here that's not happening," stating, *inter alia*, that "[w]e don't know whether that's happening or not," and that "we have no evidence" of "what's going to happen to them")); App.1148 (Sale Hrg. Tr. 167:1-11) (bankruptcy court stating that there is "zero evidence" in the record of the Newco corporate governance provisions, or of what Black Diamond would receive post-closing).[6]

---

[5] Paragraph 30 of the Sale Order gives Newco the right to 50 percent of the net cash proceeds recovered, after payment of, *inter alia*, costs of administration, liquidation, or otherwise (such costs to be allocated ratably to 100% of the value recovered) from the "RemainCo" Assets that, but for such payment, otherwise would be distributed to unsecured creditors on account of such claims. *See* App.836-965 (Sale Order).

[6] According to a valuation analysis prepared by Metaldyne's investment banker Lazard Freres & Co. LLC, Black Diamond would have received a 20% recovery on its claim under the combined cash bids on the table before being chilled by the Newco Bid. *See* App.1428 (analysis attached to Macakanja Decl.); *see also* App.1104-05, 1110 (Sale Hrg. Tr. 123:22-124:6; 130:15-19).

Nor is there any record evidence of the source of the $50.5 million in cash that Newco is to supply in order to make the $39.5 million cash payment to Metaldyne and to fund $8.5 million in administrative claims and a $2.5 million litigation trust for the Creditors Committee.

## E. The Sale Hearing And Orders

The bankruptcy court conducted the sale hearing on August 7, after denying Black Diamond's Emergency Motion from the bench. App.1001 (Sale Hrg. Tr. 20:17-18); App.971 (Sale Opinion at 6).[7] On August 12, 2009, the court issued an opinion, *see* App.966-81, and an order approving the sale of substantially of the Debtors' assets free and clear of liens to Newco, including Black Diamond's liens, *see* App.836-965 (Sale Order). Of note, and providing a basis for a discrete remedy in this appeal, Paragraph O of the Sale Order provides:

> Those holders of Claims who did object fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code and are adequately protected by having their Claims, if any, attach solely to the proceeds of the Sale Transaction ultimately attributable to the property against which they have a Claim, in the same order of priority and with the same validity, force and effect that such creditor had prior to the Sale Transaction, subject to any defenses of the Debtors.

App.843 (Sale Order ¶ O).

The bankruptcy court overruled Black Diamond's objection, characterizing it as a dispute with the Agent, the Lenders, and Newco, *see* App.973 (Sale Opinion at 8 n.7), and stated that the sole issue is the interpretation of "substantively identical contract provisions" interpreted by the Second Circuit in *Chrysler*, and by Delaware Bankruptcy Judge Walsh in *In re GWLS Holdings, Inc.*, No. 08-12430, 2009 WL 453110 (Bankr. D. Del. Feb. 23, 2009), *see* App.980 (Sale Opinion at 15 n.12).

The bankruptcy court held that no amendment to the Loan Documents was required to effectuate a sale through a credit bid, *see* App.977 (Sale Opinion at 12), and that the Loan

---

[7] Black Diamond filed requests for findings of fact and rulings of law (App.825-32), and an objection to the finding and rulings embedded in the proposed sale order (App.833-35).

Documents authorized the Agent to (i) credit bid on behalf of all the Lenders over the objection of a dissenting Lender, and (ii) release all liens on the collateral. App.976-79 (*id.* at 11-14). Once the Agent released the liens, the bankruptcy court held, Black Diamond was no longer a secured creditor entitled to adequate protection. App.978 (*id.* at 13 n.11). The bankruptcy court cited no case in which junior creditors received cash proceeds from the sale, while non-consenting secured lenders were forced to accept equity in an undescribed venture and stripped of their liens in unsold collateral.

## STANDARD OF REVIEW

An order approving the sale of substantially all of a debtor's assets pursuant to section 363 of the Bankruptcy Code is reviewed for abuse of discretion. *See Committee of Equity Sec. Holders v. Lionel Corp.* (*In re Lionel Corp.*), 722 F.2d 1063, 1071 (2d Cir. 1983). Abuse of discretion is defined as "(i) a decision rest[ing] on an error of law (such as application of the wrong legal principle) or a clearly erroneous factual finding,' or (ii) a decision that, 'though not necessarily the product of a legal error or a clearly erroneous factual finding[,] cannot be located within the range of permissible decisions.'" *Schwartz v. Aquatic Dev. Group, Inc. (In re Aquatic Dev. Group, Inc.)*, 352 F.3d 671, 678 (2d Cir. 2003) (quoting *Zervos v. Verizon N.Y., Inc.*, 252 F.3d 163, 169 (2d Cir. 2001)); *see also Official Comm. of Unsecured Creditors of LTV Aerospace & Def. Co. v. LTV Corp. (In re Chateaugay Corp.)*, 973 F.2d 141, 145 (2d Cir. 1992) (review of section 363 sale order is for clear error in the bankruptcy court's finding that there was a good business reason to allow the transaction).

## SUMMARY OF ARGUMENT

A.      The bankruptcy court committed clear error in approving the Newco Bid and sale transaction over Black Diamond's objection. Nothing in section 363 of the Bankruptcy Code authorized the Sale Order, and sections 361 and 363(e) prohibit a bankruptcy court from stripping a secured creditor's claim and security interests in exchange for an equity interest in a

new venture as to whose structure or value no evidence was offered, where constituents junior in priority are guaranteed sale proceeds, and former collateral remains unsold in the estate.

B.    The bankruptcy court's conclusion that Black Diamond consented to the sale through the Loan Documents was also clear error.  The Loan Documents did not authorize the Agent to bid Black Diamond's claim over its objection, and did not authorize the Agent to force Black Diamond to accept an equity share in a new venture organized and controlled by the Sponsors.  The *Chrysler* and *GWLS* decisions did not address compulsory acceptance of equity shares in a new company as "payment" in respect of a secured claim; nor they involve payment of junior interests and the extinguishment of claims or liens in unsold collateral.

C.    The bankruptcy court's Sale Order amounted to approval of an impermissible *sub rosa* plan of reorganization and also was clear error.

D.    The bankruptcy court's finding that the Sponsors acted in good faith under section 363(m) of the Bankruptcy Code was unsupported by the evidence and was clear error.

E.    So egregious were the lack of disclosure and denials of reasonable requests for notice and an opportunity to be heard that the bankruptcy court's orders violated Black Diamond's constitutional rights to be protected from a deprivation of property without due process.

F.    Because it did not consent to the extinguishment of its secured claim and was not provided with adequate protection, and because the Newco Bid was accepted as a 100-cent bid, Black Diamond is entitled to payment in the full amount of its secured claim.  This relief can be granted from the cash proceeds of the sale without unwinding the transfer of assets.

## ARGUMENT

### A.    Section 363 Of The Bankruptcy Code Does Not Authorize The Sale.

#### 1.    The law of credit bidding

*Credit Bidding under State Law*.  Analysis of the theory that the sale was authorized under section 363 of the Bankruptcy Code must begin with an understanding of credit bidding.

A secured creditor has a range of remedial powers where its borrower is in default. Among them is to conduct a commercially reasonable sale of the collateral. *See* U.C.C. §§ 9-610(a)-(b) (2008). The sale may be public or private, although collateral is often publicly auctioned. U.C.C. § 9-610(b). The winning bidder takes the collateral, and sale proceeds are distributed to secured creditors in the order of their priority. U.C.C. § 9-615(a). Surplus funds are delivered to the debtor, to be distributed according to priorities established by law. U.C.C. § 9-615(d). Of importance, where the secured debt is broadly held, nothing in applicable law permits an agent to construct a new investment to acquire the collateral and distribute, in lieu of sale proceeds, shares in the new investment.

At such a sale, a secured creditor may compete with other bidders for the collateral, using its secured debt as currency. This is known as "credit bidding." U.C.C. § 9-610(c). A secured creditor, fearing that the sale process has undervalued its collateral, may protect itself by bidding a sufficient amount of debt to take ownership of the collateral (which it may then sell for its own account).[8]

*Section 363.* Where the debtor is a title 11 debtor, section 363(b) permits essentially the same process to go forward. The debtor may sell assets out of the ordinary course of business and apply proceeds to, in the first instance, secured creditors. Section 363(k) permits a secured creditor to use its secured debt as currency in an auction:

> At a sale under subsection (b) of this section of property that is subject to a lien that secures an allowed claim, unless the court for cause orders otherwise *the holder of such claim may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property.*

---

[8] Two examples will illustrate:

(i) Suppose debtor D is in default to secured creditor C on $100 of debt, which is secured by D's inventory. C conducts an auction (whose administrative cost is $2). The high bid is $50. C may credit bid $51. C takes ownership of the inventory, pays $2 to the costs of sale, applies the net $49 to the secured debt, and its claim against D is reduced to $51.

(ii) Now suppose the auction yields $125. C pays $2 from the sale proceeds to administrative costs, applies $100 to extinguish the debt, and pays the balance of $23 to D.

11 U.S.C. § 363(k) (emphasis supplied). Nothing in section 363 permits a secured creditor to apply sale proceeds to the claims of junior creditors without paying the claims of other secured creditors in full, or to compel non-consenting secured creditors to accept equity in an undescribed acquisition vehicle, or to strip secured lenders of their liens in unsold collateral. Section 363(e), however, which governs all sales of property, regardless of credit bidding, requires that adequate protection be provided to a secured creditor before its property interest is impaired—or, in this case, extinguished. *See* 11 U.S.C. § 363(e), discussed *infra*.

*The Chapter 11 Plan Confirmation Process.* Bankruptcy law affords a chapter 11 debtor many powers beyond the power to conduct section 363 sales. Through the plan process, claims may be extinguished and discharged, and junior classes may receive treatment that contradicts the usual statutory priority. *But none of these powers may be accomplished through a section 363 sale outside the plan process.* It is well established that that debtors may not circumvent the Bankruptcy Code's confirmation requirements, with its attendant creditor protections, through a section 363 sale. *See*, *e.g.*, *Contrarian Funds, LLC. v. WestPoint Stevens, Inc. (In re WestPoint Stevens, Inc.)*, 333 B.R. 30, 52 (S.D.N.Y. 2005). There is nothing in either applicable state law or section 363 that permits junior constituencies, such as unsecured creditors and administrative creditors, to be preferred to secured creditors, or to compel non-consenting secured creditors to accept equity in a new company, or to strip secured lenders of their liens in unsold collateral.

2.      **The bankruptcy court erred in withholding adequate protection.**

Section 363(e) provides that "*[n]otwithstanding any other provision of* [section 363] . . . on request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e) (emphasis supplied). *See Metromedia Fiber Network Servs. v. Lexent, Inc. (In re Metromedia Fiber Network, Inc.)*, 290 B.R. 487, 491 (Bankr. S.D.N.Y. 2003) ("The relief which must be provided is 'adequate protection' for the entity's security interest in the

property. And the Court 'shall prohibit' the debtor from using, selling or leasing the property if necessary to provide adequate protection."); *Travelers Life &Annuity Co. v. Ritz-Carlton of D.C., Inc. (In re Ritz-Carlton of D.C., Inc.)*, 98 B.R. 170, 173 (S.D.N.Y. 1989) ("for adequate protection purposes a secured creditor's position *as of the petition date* is entitled to adequate protection").

As a secured creditor, Black Diamond held a valuable property interest—a secured claim. The Sale Order extinguished it. The provision of adequate protection was therefore mandatory. *See Metromedia*, 290 B.R. at 491 ("Section 363(e) is not permissive or discretionary—it states that the court 'shall' grant the relief specified, at any time, on request of the secured entity."); *United States v. Booth Tow Servs., Inc.*, 64 B.R. 539, 543 (W.D. Mo. 1985) ("Where adequate protection is warranted, the Bankruptcy Court's duty to provide it is mandatory."). "Adequate protection" must be property constituting the "indubitable equivalent" of that interest. *See* 11 U.S.C. § 361 (adequate protection may be provided by (1) cash, (2) an additional or replacement lien, or (3) other relief that provides the indubitable equivalent of the interest in such property). Metaldyne had the burden to prove the adequacy of the protection afforded. *See* 11 U.S.C. § 363(p). But no protection was afforded by the Sale Order except the license to go to state court and bring suit, and the right to be forced to accept equity shares in a new company as to whose value and corporate governance no evidence was offered. Neither remedy was the indubitable equivalent of valuable property.

### 3. The bankruptcy court erred in ruling that Section 363(k) of the Bankruptcy Code authorized the sale.

Bankruptcy law is not intended to adjust the parties' rights and obligations capriciously, and the Supreme Court has cautioned that a party should not receive "a windfall merely by reason of the happenstance of bankruptcy." *See, e.g.*, *Butner v. United States*, 440 U.S. 48, 55 (1979) (quoting *Lewis v. Manufacturers Nat'l Bank,* 364 U.S. 603, 609 (1961)). Black Diamond's claims could lawfully be impaired in the manner ordered by the bankruptcy court only through the plan confirmation process. The Sale Order extinguished security interests in

unsold collateral, reserved distributions to junior creditors, and transferred a going-concern business to a Newco about which no evidence was offered, other than that its capital structure was devised by its Sponsors without oversight or review by any court, and that its participants would somehow have to raise more than $50 million to capitalize it.

The bankruptcy court concluded that section 363(k) of the Bankruptcy Code authorizes this scheme. But section 363(k) merely permits a secured creditor to use debt as currency at an auction for collateral. It says nothing of forcing non-consenting lenders to take equity, or discharging deficiency claims, or paying junior interests without paying senior secured interests. Nor did the bankruptcy court cite any case holding that it does.

It is well settled that section 363 cannot be used to circumvent the reorganization process. *See Institutional Creditors of Cont'l Air Lines, Inc. v. Cont'l Air Lines, Inc. (In re Cont'l Air Lines, Inc.)*, 780 F.2d 1223, 1225 (5th Cir. 1986) (chapter 11 debtor cannot use Section 363(b) to circumvent the protection creditors have during the plan confirmation process); *WestPoint Stevens*, 333 B.R. at 52 (well established that Section 363(b) is "not to be utilized as a means of avoiding Chapter 11's plan confirmation procedures."); COLLIER ON BANKRUPTCY ¶ 363.02[4] (15th ed. rev. 2005) ("Attempts to determine plan issues in connection with the [Section 363(b)] sale will be improper and should result in a denial of the relief requested.").

In *WestPoint Stevens*, the court upheld a challenge by first-lien lenders to "the in-kind distribution, claim satisfaction and lien release provisions of [a section 363] Sale Order" because that order effectively converted the lenders' "secured monetary claims against the Debtors into an illiquid minority equity interest in the parent of successor entities" controlled by a bidding group. 333 B.R. at 34. The court determined that the sale order was improper because it "authorized and directed operating assets as well as the direct distribution to creditors of the consideration paid for those assets and the termination of liens and other interests" and therefore "clearly constituted an attempt to determine or preempt plan issues in the context of the Section 363(b) sale." *Id.* at 52. The same result should obtain here.

**B.  Black Diamond Did Not Consent To The Newco Bid Or The Sale Order.**

The Sale Order cannot be upheld on the theory that Black Diamond consented to it through the Loan Documents.  To prevail on a contract-based theory, Metaldyne bore the burden of proof, *see* 11 U.S.C. § 363(p), to show that the bidder was authorized to: (i) submit the credit bid on Black Diamond's behalf without Black Diamond's consent; and (ii) foreclose Black Diamond from sharing ratably in the purchased assets except by the consent of Black Diamond, and force it to take equity.  Neither showing was made.

**1.  The Loan Documents do not authorize the Sponsors to conduct a credit bid without each creditor's consent.**

No provision of the Credit Agreement expressly authorizes the Agent to make a credit bid.  Section 7, setting forth Events of Default, provides that the Agent may accelerate the obligations.  App.1255  (Credit Agreement § 7.01).  Article VIII gives the Administrative Agent "discretionary rights and powers," but only those "contemplated by the Loan Documents."

The bankruptcy court rested its contractual theory on section 5.01 of the Security Agreement (a defined "Loan Document" under the Credit Agreement).  Section 5.01 does not expressly authorize the agent to credit bid for the lenders; the bankruptcy court concluded that credit bidding was "applicable law" within the authorization to "exercise any and all rights afforded to a secured party under the Uniform Commercial Code or other applicable law." App.973-74 (Sale Opinion at 8-9 (citing Security Agreement)).  But section 5.01 provides that the *debt* the Collateral Agent may credit bid is only that which it is authorized to credit bid *by discrete secured creditors bidding their discrete secured debt*:

> At any public (or, to the extent permitted by law, private) sale made pursuant to this Section, *any Secured Party* may bid for or purchase . . . the Collateral or any part thereof offered for sale and may make payment on account thereof *by using any claim then due and payable to such Secured Party* from any Grantor as a credit against the purchase price, and such Secured Party may, upon compliance with the terms of sale, hold, retain and dispose of such property without further accountability to any Grantor therefor.

16

App.1289 (Security Agreement § 5.01) (emphasis supplied). Section 5.01 thus allows a Secured Party[9] to make use of the specific "claim then due and payable to *such* Secured Party" in a credit bid (emphasis supplied), but does not authorize a Secured Party to credit bid using any other Secured Party's claim. *Id.* Therefore, although nothing in the Loan Documents prevented other Secured Parties from authorizing the Agent to exercise their credit bidding rights, nothing authorized the Agent to bid Black Diamond's claim without its consent.

### 2. The Loan Documents did not authorize the Sponsors to "credit bid" through Newco.

Even if the Loan Documents were read to confer a general power to credit bid for non-consenting Lenders, they did not authorize the Agent to force them to accept anything other than cash, or a ratable share of the assets themselves. Section 5.01 of the Security Agreement contemplates, upon a consented-to credit bid, that "the Collateral Agent shall have the right . . . to sell or otherwise dispose of all or any part of the Collateral . . . for cash, upon credit or future delivery as the Collateral Agent shall deem appropriate." App.1289 (Security Agreement § 5.01). Section 5.02 carries on in like vein with rules for the distribution of proceeds from collateral sales. The first priority is to administrative expenses. Second is "to the *payment* in full of the Obligations." App.1290 (Security Agreement § 5.02) (emphasis supplied). Nothing in this language authorizes the formation of a new company and the distribution of its equity over the objection of non-consenting secured lenders.

The Security Agreement permits the Agent to expend necessary expenses to preserve collateral, but those terms permit only that a Lender in possession of collateral may dun the Lenders for expenses of collateral preservation *that the borrower fails to pay*. *See* App.1292 (Security Agreement § 6.06(a)) The Sale Order leaves no Lender in possession of collateral. With the extinguishment of the debt, the assets are no longer collateral, Metaldyne owes no

---

[9] The term "Secured Party" is defined in Section 1.02 of the Security Agreement in a manner broad enough to include both the Agent and Black Diamond. App.1279 (Security Agreement § 1.02).

reimbursement obligation, and therefore the bidder has no right to seek reimbursement from the Lenders. *See id.* § 6.06(c).

Section 9.02(b) of the Credit Agreement contains what amounts to a *prohibition* against the Sale Order absent the consent of each of the Lenders, stating that the Credit Agreement may be amended in certain respects, "*provided* that no such agreement [to amend] shall . . . "(vi) release all or substantially all of the Collateral from the Liens of the Security Documents, without the written consent of *each* Lender." App.1262-63 (Credit Agreement § 9.02(b)) (emphasis supplied). The Sale Order releases the security interests on unsold collateral, and does not provide for full payment of the Lenders' secured claims (far from it)—all notwithstanding the Credit Agreement's prohibition of a release of collateral without the written consent of *each* Lender. In addition, although it appears that meaningful participation in the Newco requires that a Lender contribute a certain amount of new value, Section 9.02(b)(i) of the Credit Agreement prohibits any agreement that "increase[s] the Commitment of any Lender without the written consent of such Lender." *See* App.1262 (Credit Agreement 9.02 (b)(i)).

In short, even if it was authorized to credit bid the claims of other Secured Parties, the Agent could only (i) bid for the assets and distribute them, or (ii) bid for the assets, sell them later for cash, and distribute the cash ratably to the lenders. *See* App.1288-90 (Security Agreement §§ 5.01 & 5.02); App.1096-97 (Sale Hrg. Tr. 115:21-116:20).

The bankruptcy court relied on *Chrysler*, 576 F.3d 108, and *GWLS Holdings*, 2009 WL 453110, which it characterized as interpreting "substantively identical contract provisions." App.980 (Sale Opinion at 15 n.12). But neither decision involved payment of junior interests, the extinguishment of claims or liens, or, so far as the decision shows, a new venture whose equity would be distributed as "proceeds" to the secured creditors. *Chrysler* did not involve a credit bid at all, but consent to a sale, and as the bankruptcy court itself recognized at the sale hearing, the objecting secured creditors in *Chrysler* "were being treated exactly the same way as all of the other secured debtholders. They would share pro rata in the 2 billion dollars that those secured creditors—that the debtors would receive and through the absolute priority rule would

distribute first to the secured creditors, pro rata. . . . [T]he 2 billion dollars was coming to the estate, and the estate was going to distribute it, and it would distribute it on a pro rata basis. That's not happening here." App.1125, 1134-35 (Sale Hrg. Tr. 144:12-17;153:24-154:2).

In *GWLS*, no objection was raised to the *form* of distribution to the "drag-along" bidder and there was no decision whether non-consenting secured lenders could be forced to take equity and stripped of their liens in unsold collateral, while junior creditors received cash proceeds from the sale. There again, the only question was whether the agent could make the bid in the first place. The *GWLS* decision also does not identify language similar to Section 5.01 of the Security Agreement (stating that a Secured Party may bid for the Collateral and "make a payment on account thereof by using any claim then due and payable *to such Secured Party*"). App.1289 (Security Agreement § 5.01) (emphasis supplied).

## C. The Sale Order Is An Impermissible *Sub Rosa* Plan.

The Second Circuit has recognized that debtors are prohibited from such use, sale or lease of property that amounts to a *sub rosa* plan of reorganization. *Lionel*, 722 F.2d at 1071. *Sub rosa* plans are prohibited to prevent the debtor from entering into transactions that have the effect of "short circuit[ing] the requirements of Chapter 11 for confirmation of a reorganization plan." *Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 466 (2d Cir. 2007). In *Motorola*, the Second Circuit quoted *Pension Benefit Guar. Corp. v. Braniff Airways, Inc.* (*In re Braniff Airways, Inc.*), 700 F.2d 935, 940 (5th Cir. 1983), in which the Fifth Circuit rejected a proposed transfer agreement, in part because its terms attempted to "dictat[e] some of the terms of any future reorganization plan. The [subsequent] reorganization plan would have to allocate the [proceeds of the sale] according to the terms of the [transfer] agreement or forfeit a valuable asset." 700 F.2d at 940. The court concluded that "[t]he debtor and the Bankruptcy Court should not be able to short circuit the requirements of Chapter 11 for confirmation of a reorganization plan by establishing the terms of the plan *sub rosa* in connection with a sale of assets." *Id.* Although its recent *Chrysler* decision involved

only consent to a sale, the Second Circuit reaffirmed the validity of *sub rosa* analysis, noting that, "[p]ushed by a bullying creditor, a § 363(b) sale might evade such requirements as disclosure, solicitation, acceptance, and confirmation of a plan." 576 F.3d at 114 (citing 11 U.S.C. §§ 1122-29). And Bankruptcy Judge Gerber recently recognized that a non-plan section 363 sale "may be objectionable as a *sub rosa* plan if the sale itself seeks to allocate or dictate the distribution of sale proceeds among different classes of creditors." *In re General Motors Corp.*, 407 B.R. 463, 495 (Bankr. S.D.N.Y. 2009).

That is precisely what happened here. Newco directs distributions to chapter 11 professionals ($8.5 million) and unsecured creditors ($2.5 million), and releases liens on unsold assets for the benefit of junior creditors, without paying Black Diamond in cash for the full amount of its secured claim. This impaired Black Diamond's interests and circumvents the Bankruptcy Code's various disclosure and voting requirements and creditor protections.

The Second Circuit held in *Chrysler* that the sale at issue did not constitute a *sub rosa* plan, reasoning that the sale did not disturb the absolute priority rule because the lien holders' security interests attached to the sale proceeds—"[n]ot one penny" was being distributed to "anyone other than the First-Lien Lenders," and the equity stakes in New Chrysler were attributable to new value. 576 F.3d at 118. Far from assurance of a pro rata distribution of proceeds from the sale of Lender collateral, as in *Chrysler*, the record here contains *no* evidence of what Black Diamond is to receive for the loss of its collateral, as Metaldyne's counsel reminded the bankruptcy court and the bankruptcy court acknowledged. *See* App.1123-26 (Sale Hrg. Tr. 142:24-145:14).

## D.     The Newco Bid Violates The Good-Faith Requirement Of Section 363(m).

The Sale Order should be reversed to the extent that it gives Newco the benefit of a finding of good faith under section 363(m) of the Bankruptcy Code. The good-faith analysis focuses on the purchaser's conduct in the course of the bankruptcy proceedings, including the purchaser's actions in preparation for and during the sale. *Licensing by Paolo, Inc. v. Sinatra (In*

*re Gucci)*, 126 F.3d 380, 390 (2d Cir. 1997). The good-faith requirement prohibits fraudulent, collusive actions intended to affect the sale price or control the outcome of the sale. *Id.*

It appears that the Newco Bid was fashioned for the purpose of squeezing-out a dissident and securing committee support, rather than maximizing cash for the assets. The Sponsors, on both sides of the deal, were well aware of the limitations of the Loan Documents. Their purpose was takeover, not asset maximization. Moreover the record showed a comprehensive attempt at ambush. The terms of the sale were withheld, despite Black Diamond's requests for the relevant documents, and not disclosed until the middle of the night before the hearing. The finding of good faith was unwarranted.

**E.  The Bankruptcy Court's Orders Violated Black Diamond's Constitutional Rights.**

The denial of the Emergency Motion to adjourn and the entry of the Sale Order violated Black Diamond's rights under the Constitution of the United States. The Due Process Clause requires notice and a fair opportunity to be heard. *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950). "The notice must be of such nature as reasonably to convey the required information . . . and it must afford a reasonable time for those interested to make their appearance." *Id.*

The typical course is for a form of sale agreement and order to be distributed with bid procedures. Parties see what is proposed long before the auction, and the auction only changes the price and makes other immaterial modifications. This was dramatically different. The terms of the bid were never disclosed (despite repeated requests) until a 74-page, single-spaced, marked draft of the Purchase Agreement, with none of the schedules or exhibits referenced in the document, was circulated at 10 p.m.—eleven hours before the hearing. Black Diamond learned then for the first time of the abandonment of collateral, the release of liens and claims, and the special carve-outs for the Creditors Committee and unsecured creditors, and the other junior constituencies. It had learned the day before that a high collective cash bid, of approximately $125 million, had been cut off by the $425 million "credit bid." Neither Black Diamond nor the

bankruptcy court ever learned what cash consideration could have been achieved by continuing the Auction. Neither Black Diamond nor the bankruptcy court ever learned what Newco's debts or value were or would be, or what the value of the equity securities of Newco, which were Black Diamond's only recourse, would be.

Even by the swift timetables in which bankruptcy litigation is conducted, the time allowed for Black Diamond to prepare was grossly insufficient to evaluate this complex transaction and prepare for the hearing. By contrast, there was transparency in *GWLS* as to the nature of the credit bid, which was disclosed and filed with the court almost three months before the sale hearing, providing the parties sufficient time to evaluate the bid. A brief adjournment— for purposes of expedited discovery and information gathering—would have worked no delay in the closing of the sale. The Purchase Agreement provided for a closing deadline of October 1, 2009, which deadline could be extended, *see* App.1494, a fact Black Diamond highlighted for the bankruptcy court in its Emergency Motion, *see* App.612-13, and at the hearing, *see* App.995, 1033 (Sale Hrg. Tr. 14:11-16;52:2-4). There was no need for the bankruptcy court to proceed in such extreme haste, and its order denying the Emergency Motion was in derogation of Black Diamond's due process rights.[10]

## F.     The Remedy Is Payment In Full Of Black Diamond's Secured Claim.

The parties to the sale, and the bankruptcy court in the Sale Order, deemed the Agent's bid to be a 100-cent bid. Thus the purchaser Newco is deemed to have paid the debt in full. Regardless of appraised values, the Agent's credit bid established the price at which the assets

---

[10] The stripping of Black Diamond's claim and security interests without adequate protection violated the Fifth Amendment's prohibition against the taking of private property without compensation, *United States v. Security Indus. Bank*, 459 U.S. 70, 75, (1982) (citing *Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555, 589 (1935)), and to due process limitations, *Wright v. Union Cent. Life Ins. Co.*, 304 U.S. 502, 518 (1938). The Newco Bid approved by the bankruptcy court abrogates Black Diamond's property rights in a manner that cannot be squared with these limitations on the bankruptcy power. *See Dewsnup v. Timm*, 502 U.S. 410, 417-19 (1992) (bankruptcy law does not permit the gratuitous transfer of the value of a valid lien to the debtor); 4 COLLIER ON BANKRUPTCY, ¶ 506.03[4][a][iii] (15th ed. rev. 2004).

were sold. *See Cohen v. KB Mezzannie Fund II (In re SubMicron Sys. Corp.)*, 432 F.3d 448, 460 (3d Cir. 2006). The Agent then was obliged to distribute a ratable share of that price to the Lenders, except to the extent Lenders had consented to accept other treatment. All secured creditors other than Black Diamond consented to other treatment. Black Diamond did not. Because it was not provided with adequate protection, in violation of section 363(e), Black Diamond did not consent to the terms, and because the bid was sponsored as a 100-cent bid, relief must be payment in full. This relief can be granted without unwinding the sale, because Black Diamond's claim was small enough that it would be more than covered by the cash components of the Newco Bid.

The Court should reverse the Sale Order to the extent it forced Black Diamond to take equity in respect of its secured claim and stripped it of its lien in unsold collateral, and remand with instructions that the lien shall attach, as a priority lien to all cash proceeds of the sale, and that the bankruptcy court shall hear argument on how to allocate that claim.[11]

## CONCLUSION

For all the foregoing reasons, the Court should reverse, vacate in part, and remand: (i) holding that Black Diamond is entitled to adequate protection for the loss of its security interests; (ii) instructing that Black Diamond be granted a replacement lien and security interest on all cash proceeds of the sale to the extent of 100% of its claim; and (iii) granting Black Diamond such other and further relief as the Court deems just and proper.

---

[11] The remedy would work no injustice to any party. Paragraph O of the Sale Order provides that "holders of Claims who did object . . . are adequately protected by having their Claims, if any, attach solely to the proceeds of the Sale Transaction ultimately attributable to the property against which they have a Claim, in the same order of priority and with the same validity, force and effect that such creditor had prior to the Sale Transaction, subject to any defenses of the Debtors." App.843 (Sale Order ¶ O). Accordingly, the parties were on notice that liens may encumber the sale proceeds.

Dated: New York, New York.          **BINGHAM McCUTCHEN LLP**
      October 2, 2009


By: /s/Cassandra Aquart
     Steven Wilamowsky (2682680)
     Cassandra Aquart
     399 Park Avenue
     New York, NY 10022
     Telephone:  (212) 705-7000

     -and-

     Sabin Willett
     Rheba Rutkowski
     One Federal Street
     Boston, MA  02110
     Telephone:  (617) 951-8000

     *Counsel to BDC Finance, L.L.C.*

A/73160053.2

**ADDENDUM**

**REFERENCED STATUTES (IN RELEVANT PART)**

**BANKRUPTCY CODE SECTIONS**

## 11 U.S.C. § 361. Adequate Protection

When adequate protection is required under section 363, 363, or 364 of this title of an interest of an entity in property, such adequate protection may be provided by --

**(1)** requiring he trustee to make a cash payment or periodic cash payments to such entity, to the extent that the stay under section 362 of this title, use, sale, or lease under section 363 of this title, or any grant of a lien under section 364 of this title results in a decrease in the value of such entity's interest in such property;

**(2)** providing to such entity an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such property; or

**(3)** granting such other relief, other than entitling such entity to compensation allowable under section 503(b)(1) of this title as an administrative expense, as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property.

## 11 U.S.C. § 363 Use, sale, or lease of property

**(b)**

**(1)** The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate, except that if the debtor in connection with offering a product or a service discloses to an individual a policy prohibiting the transfer of personally identifiable information about individuals to persons that are not affiliated with the debtor and if such policy is in effect on the date of the commencement of the case, then the trustee may not sell or lease personally identifiable information to any person unless—

**(A)** such sale or such lease is consistent with such policy; or

**(B)** after appointment of a consumer privacy ombudsman in accordance with section 332, and after notice and a hearing, the court approves such sale or such lease—

**(i)** giving due consideration to the facts, circumstances, and conditions of such sale or such lease; and

**(ii)** finding that no showing was made that such sale or such lease would violate applicable nonbankruptcy law.

(**2**) If notification is required under subsection (a) of section 7A of the Clayton Act in the case of a transaction under this subsection, then—

>(**A**) notwithstanding subsection (a) of such section, the notification required by such subsection to be given by the debtor shall be given by the trustee; and

>(**B**) notwithstanding subsection (b) of such section, the required waiting period shall end on the 15th day after the date of the receipt, by the Federal Trade Commission and the Assistant Attorney General in charge of the Antitrust Division of the Department of Justice, of the notification required under such subsection (a), unless such waiting period is extended—

>>(**i**) pursuant to subsection (e)(2) of such section, in the same manner as such subsection (e)(2) applies to a cash tender offer;

>>(**ii**) pursuant to subsection (g)(2) of such section; or

>>(**iii**) by the court after notice and a hearing.

(**e**) Notwithstanding any other provision of this section, at any time, on request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest. This subsection also applies to property that is subject to any unexpired lease of personal property (to the exclusion of such property being subject to an order to grant relief from the stay under section 362).

(**f**) The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if—

>(**1**) applicable nonbankruptcy law permits sale of such property free and clear of such interest;

>(**2**) such entity consents;

>(**3**) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

>(**4**) such interest is in bona fide dispute; or

>(**5**) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

(**k**) At a sale under subsection (b) of this section of property that is subject to a lien that secures an allowed claim, unless the court for cause orders otherwise the holder of such claim may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property.

A/73160053.2

**(m)** The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

**(p)** In any hearing under this section—

    **(1)** the trustee has the burden of proof on the issue of adequate protection; and

    **(2)** the entity asserting an interest in property has the burden of proof on the issue of the validity, priority, or extent of such interest.

## UNIFORM COMMERCIAL CODE SECTIONS

### U.C.C. § 9-610. Disposition of Collateral after Default

**(a) Disposition after default.**

After default, a secured party may sell, lease, license, or otherwise dispose of any or all of the collateral in its present condition or following any commercially reasonable preparation or processing.

**(b) Commercially reasonable disposition.**

Every aspect of a disposition of collateral, including the method, manner, time, place, and other terms, must be commercially reasonable. If commercially reasonable, a secured party may dispose of collateral by public or private proceedings, by one or more contracts, as a unit or in parcels, and at any time and place and on any terms.

**(c) Purchase by secured party.**

A secured party may purchase collateral:

    **(1)** at a public disposition; or

    **(2)** at a private disposition only if the collateral is of a kind that is customarily sold on a recognized market or the subject of widely distributed standard price quotations.

A/73160053.2

**U.C.C. § 9-615**. **Application of Proceeds of Disposition; Liability for Deficiency and Right to Surplus**

**(a) Application of proceeds.**

A secured party shall apply or pay over for application the cash proceeds of disposition under Section 9-610 in the following order to:

**(1)** the reasonable expenses of retaking, holding, preparing for disposition, processing, and disposing, and, to the extent provided for by agreement and not prohibited by law, reasonable attorney's fees and legal expenses incurred by the secured party;

**(2)** the satisfaction of obligations secured by the security interest or agricultural lien under which the disposition is made;

**(3)** the satisfaction of obligations secured by any subordinate security interest in or other subordinate lien on the collateral if:

**(A)** the secured party receives from the holder of the subordinate security interest or other lien an authenticated demand for proceeds before distribution of the proceeds is completed; and

**(B)** in a case in which a consignor has an interest in the collateral, the subordinate security interest or other lien is senior to the interest of the consignor; and

**(4)** a secured party that is a consignor of the collateral if the secured party receives from the consignor an authenticated demand for proceeds before distribution of the proceeds is completed.

A/73160053.2