**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x:

In re: Metaldyne Corporation, *et al.*,    :  Chapter 11 Case No.
                :  09-13412 (MG)
         Debtors.  :

-------------------------------------------------------- x
                 :
                 :
                 :

BDC FINANCE, L.L.C.         :
        Appellant,   :  District Court Case No.
                :  09-cv-07897 (DLC)
 -against-           :
                 :

METALDYNE CORPORATION, *et al.*, MD  :
INVESTORS CORPORATION     :
        Appellees.   :

-------------------------------------------------------- x

## APPELLEE BRIEF OF THE DEBTORS

# TABLE OF CONTENTS

Page

Preliminary Statement .................................................................................................2

Statement of the Case ..................................................................................................3

    A.    The Debtors' Chapter 11 Cases.............................................................3

    B.    The Debtors' Secured Lenders ..............................................................3

    C.    The Term Lenders and BDC .................................................................4

    D.    The Sale Process....................................................................................4

    E.    The Auction ...........................................................................................6

    F.    The MD Investors Transaction .............................................................7

    G.    The Sale Hearing ...................................................................................8

Argument .....................................................................................................................9

I.      Appellant's Failure to Seek a Stay of the Sale Order Renders Its Arguments
Equitably and Statutorily Moot ......................................................................9

II.    The Sale Order Should Be Affirmed Because the Administrative Agent Was
Authorized to Credit Bid the Full Amount of the Outstanding Debt Under the
Loan Documents...............................................................................................9

    A.    The Loan Documents Authorized the Administrative Agent to Credit Bid
the Claims of the Term Lenders. ........................................................10

    B.    BDC "Irrevocably" Authorized the Administrative Agent to Credit Bid
BDC's Claim when BDC Entered Into the Credit Agreement.............11

          1.    The Provisions of Section 5.01 of the Security Agreement that
Govern the Sale of Collateral "by" the Collateral Agent Did Not
Require the Agent to Obtain BDC's Consent to the Credit Bid ..............13

          2.    Section 9.02(b)(vi) of the Credit Agreement Did Not Require the
Agent to Obtain BDC's Consent to the Credit Bid .................................14

    C.    BDC Is Not Entitled to "Adequate Protection" of any Interest as a Result
of the Sale of the Collateral to the Administrative Agent. ..................19

    D.    The Sale Order Does Not Deprive BDC of any Rights It May Have Under
the Loan Documents with respect to the Credit Bid Assets. ...............20

III.   BDC's Remaining Challenges to the Sale Order Have No Merit...................20

    A.    BDC Does Not Have Standing To Challenge the Sale Order ...............20

    B.    Even If Appellant had Standing To Challenge the Sale Order, Its
Arguments Fail on the Merits..............................................................22

          1.    Sub Rosa Plan.........................................................................22

# TABLE OF CONTENTS
(continued)

**Page**

2.   Good Faith ........................................................................................23

3.   Due Process ......................................................................................24

Conclusion ...................................................................................................25

## TABLE OF AUTHORITIES

Page

CASES

Am. Mfrs. Mut. Ins. Co. v. Sullivan,
    526 U.S. 40 (1999) ................................................................................................4

Bank of Tokyo-Mitsubishi Ltd. v. Enron Corp. (In re Enron Corp.),
    2005 WL 356985 (S.D.N.Y. Feb. 15, 2005) ..................................................19, 21

Bay Harbour Mgmt., L.C. v. Lehman Bros. Holdings, Inc. (In re Lehman Bros. Holdings,
    Inc.),
    2009 WL 667301 (S.D.N.Y. Mar. 13, 2009).........................................23, 24, 25

Beal Sav. Bank v. Sommer,
    8 N.Y.3d 318 (2007).......................................................................15, 17, 21

Credit Francais Int'l S.A. v. Sociedad Financiera de Comercio, C.A.,
    128 Misc. 2d 564 (Sup. Ct. New York County 1985) ............................................21

Friedman v. Chesapeake & Ohio Ry. Co.,
    261 F. Supp. 728 (S.D.N.Y. 1966) ....................................................................21

In re Chrysler,
    405 B.R. 84 (Bankr. S.D.N.Y. 2009)...........................................17, 18, 20, 21, 22

In re Delta Air Lines,
    370 B.R. 537 (Bankr. S.D.N.Y. 2007)................................................................21

In re Enron Corp.,
    302 B.R. 463 (Bankr. S.D.N.Y. 2003), aff'd ...............................................21, 22

In re Gucci,
    126 F.3d 380 (2d Cir. 1997) .............................................................................23

In re GWLS Holdings, Inc.,
    2009 WL 453110 (Bankr. D. Del. Feb. 23, 2009)................................11, 15, 16, 17

Ind. State Police Pension Trust v. Chrysler LLC (In re Chrysler LLC),
    576 F.3d 108 (2d Cir. 2009) ............................................12, 17, 18, 20, 21, 22

STATUTES

11 U.S.C. § 363 .............................................................2, 9, 10, 11, 12, 13, 16, 17, 19, 24

Uniform Commercial Code § 9-611 ..................................................................13

TO THE HONORABLE DENISE COTE,
UNITED STATES DISTRICT COURT JUDGE:

Appellee Metaldyne Corporation ("<u>Metaldyne</u>") and the other above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>") respectfully file this Brief in Opposition to the appeal (the "<u>Appeal</u>") of Appellant BDC Finance, L.L.C. ("<u>BDC</u>" or "<u>Appellant</u>"), of the Order, dated August 12, 2009, of Judge Martin Glenn of the Bankruptcy Court (the "<u>Bankruptcy Court</u>") for the Southern District of New York (the "<u>Sale Order</u>").[1]

### **Preliminary Statement**

BDC's Appeal essentially boils down to two arguments.  First, BDC argues that the administrative agent under the Debtors' prepetition term loan facility did not have the authority to "credit bid" BDC's secured claim under that facility to acquire the collateral at the Debtors' auction of its assets pursuant to section 363(b) of the Bankruptcy Code.  Second, BDC argues that it cannot be compelled to accept equity in the acquisition vehicle to which the administrative agent assigned the assets that it purchased with its credit bid.

BDC's first argument fails because the relevant loan documents clearly establish that BDC authorized the administrative agent to credit bid BDC's secured claim when BDC acquired that claim in the first instance.  BDC's second argument fails because the Sale Order does not compel BDC to accept equity in the acquisition vehicle that received the purchased assets; in fact, the Bankruptcy Court expressly modified the Sale Order to preserve whatever rights BDC may have, if any, against the recipients of those assets to demand some other form of consideration in order to receive its <u>pro rata</u> share of the value of the collateral that secured BDC's claim.  Accordingly, the Sale Order should be affirmed.

---

[1]      The Sale Order is attached hereto as Exhibit A.  On August 12, 2009, the Bankruptcy Court issued an Opinion stating the rationale underlying the Sale Order (the "<u>Sale Opinion</u>").  The Sale Opinion is attached hereto as Exhibit B.

## Statement of the Case

### A.    The Debtors' Chapter 11 Cases

On May 27, 2009 (the "Petition Date"), the Debtors filed voluntary petitions for relief

under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  Metaldyne,

along with each of the other Debtors and each of the Debtors' nondebtor subsidiaries

(collectively, the "Metaldyne Companies") were, on the Petition Date, leading global

manufacturers of highly engineered metal components for the global light vehicle market and are

among the 50 largest auto parts suppliers in North America.  Supp. App. 9-11.[2]  The Metaldyne

Companies operated as of the Petition Date through two primary business units, the powertrain

segment (the "Powertrain Assets") and the chassis segment (the "Chassis Assets").  Id.

### B.    The Debtors' Secured Lenders

From June 23, 2009 through the October 16, 2009 closing of the sale transaction at issue

here (the "Closing Date"), the Debtors had three principal groups of secured lenders:  (A) lenders

(the "DIP Lenders") under the Debtors' postpetition financing facility (the "DIP Financing

Facility"), which made up to $19.9 million available to the Debtors;[3] (B) lenders (the "Term

Lenders") under the Debtors' prepetition term loan facility holding approximately $425 million

in secured claims; and (C) lenders (the "ABL Lenders") under the Debtors' revolving credit

facility governed by the prepetition asset backed loan agreement holding approximately $35

million in secured claims.  Supp. App. 15-20, 161-168.  While the relative payment priorities of

each group's interests in the collateral securing these obligations are complex, in general, the

Term Lenders had a first priority lien on most (but not all) of the Debtors' personal and real

---

[2]        Citations to "App. [___]" refer to the Appendix submitted to the Court by BDC.  Citations to "Supp. App. [___]" refer to the Supplemental Appendix Submitted to the Court by the Debtors.

[3]        Ultimately, the Debtors did not borrow funds under the DIP Financing Facility.  Upon the closing of the sale transaction at issue here (the "Closing"), the DIP Financing Facility expired.

property, with a second priority lien on the Debtors' working capital (including inventory and accounts receivable), and the ABL Lenders had a first priority lien on the Debtors' working capital, and a second priority lien on the Debtors' personal and real property.  Supp. App. 17-23.[4]

### C.    The Term Lenders and BDC

As of the Petition Date, the Debtors' outstanding obligations to the Term Lenders exceeded $425 million.  Supp. App. 16-17.  Of this amount, BDC held approximately $3.5 million (or less than 1% of the total Term Lender debt).  App. 972 (Sale Opinion at 7).

The respective rights of the Term Lenders are governed under the terms of a credit agreement (the "Credit Agreement") and a security agreement (the "Security Agreement" and together with the Credit Agreement, the "Loan Documents"), both dated January 11, 2007.  App. 971-72.  Pursuant to the Loan Documents, each Term Lender irrevocably appointed JPMorgan Chase Bank, N.A. ("JPMorgan") as both its Administrative Agent and its Collateral Agent, thus giving JPMorgan the authority to act "on behalf" of – and exercise the rights of – each Term Lender upon an event of default under the Loan Documents.  See App. 1259-61.

### D.    The Sale Process

As a condition of its DIP Financing Facility, Metaldyne was required to pursue a sale of its major assets within 60 days (with the potential for a 30 day extension).  App. 1432.  Because

---

[4]    A detailed chart of the liens attaching the Debtors' collateral is attached as Exhibit A of the Debtors' Motion for an Order Authorizing the DIP Financing Facility.  Supp. App. 153-54.  As of the Petition Date, one third of the Debtors' ownership interest in their foreign subsidiaries was not part of the collateral that secured the Debtors' secured loan obligations.  Supp. App. 17-18.  After the Petition Date, the Debtors' one third interest in their foreign subsidiaries was offered as adequate protection to the secured lenders under the final order approving the DIP Financing Facility.  Supp. App. 207-08.  During the sale process at issue here, the Official Committee of Unsecured Creditors (the "Creditors' Committee") argued that this one third interest in the Debtors' foreign subsidiaries was available to pay some portion of the claims of the Debtors' unsecured creditors.  Supp. App. 299.  In addition, mortgages for five parcels of real property were executed in April 2009 pursuant to an October 2008 agreement and provided additional security to the Term Lenders (the "Mortgages") but remained subject to possible challenge and avoidance as preferential transfers under the terms of the DIP Order.  See Supp. App. 18, 186, 212-14.  Accordingly, some of the collateral in which the Term Lenders asserted an interest was subject to dispute that was resolved as part of the entry of the Sale Order.

of this strict deadline, the Debtors expeditiously worked with their investment banking, financial and legal advisors (collectively, the "Advisors") to secure bids that maximized the value of their assets. App. 1432. In order to ensure the fairness in the selection of the winning bidder(s), the Debtors formed a special committee (the "Special Committee") comprised of two independent directors to assist with the analysis of the bids for Metaldyne's assets. App. 1430-31.

In June 2009, the Debtors filed separate motions (the "Sale Motions") to approve bidding and sale procedures (collectively, the "Bidding Procedures") for the sale of the Powertrain and Chassis Assets. The Bankruptcy Court approved the Bidding Procedures on June 25, 2009 and July 8, 2009, respectively (collectively and as amended, the "Bidding Procedures Orders"). Pursuant to the Bidding Procedures Orders, the Debtors were authorized to solicit potential purchasers for the Powertrain and Chassis Assets (or substantially all of their assets) up until the bid deadlines for each class of assets, and then, assuming that there was more than one "Qualified Bidder" (defined in the Bidding Procedures Orders), to hold an auction for the Chassis and Powertrain Assets. See App. 562-82; 592-605.

The Debtors, with their Advisors, conducted a wide-ranging marketing process for both the Powertrain and Chassis Assets in accordance with the Bidding Procedures Orders. App. 1415-22. Ultimately, the Debtors recognized three Qualified Bidders for the Powertrain Assets: (1) a bid from Hephaestus Holdings, Inc. ("HHI," whose bid was initially characterized as the "stalking horse bid" for the Powertrain Assets); (2) a bid from ACOF Operating Manager III, LLC ("Ares," whose bid, together with the HHI bid, the "Individual Powertrain Bids"); and (3) MD Investors Corporation ("MD Investors"), an entity formed by certain of the Debtors' Term Lenders (the "MD Investors Bid"). The Individual Powertrain Bids each contemplated the purchase of only the Powertrain Assets while the MD Investors Bid

contemplated the purchase of the majority of the Debtors' operating assets including the Powertrain and Chassis Assets, as well as the Debtors balance shaft modules business and tubular products business.  App. 1420-21.  Only one party, an entity affiliated with The Carlyle Group and its portfolio company, Diversified Machine, Inc., was an active Qualified Bidder for the Debtors' Chassis Assets ("Individual Chassis Bid") at the time of the auction.  App. 1434.

### E.    The Auction

On August 5, 2009 and August 6, 2009, the Debtors held an auction (the "Auction"), for their major assets.  App. 1422-37.  In accordance with the Bidding Procedures, the Individual Powertrain Bidders bid against one another to determine the highest individual bid for Powertrain Assets, and Ares won with a bid of $100 million.  Id.  The Debtors then gave MD Investors an opportunity to submit a bid that was higher and better than the aggregate value of the Individual Chassis Bid and the final Ares bid (together, the "Aggregate Individual Bids").  Id.

Upon receiving the MD Investors initial bid, the Debtors, in consultation with the Special Committee and the Advisors, determined that the Aggregate Individual Bids were superior. After intensive negotiations during which MD Investors improved its bid, the Debtors adjourned the Auction to clarify the terms of the MD Investors Bid.  App. 1423; 1436.

Prior to reconvening the Auction, the Special Committee, with its and the Debtors' Advisors, reviewed analyses of competing bid options, including a detailed comparison of the MD Investors Bid and the Aggregate Individual Bids.  The Special Committee considered, among other things, the aggregate face value of each bid, the estimated recoveries for interested parties, the risks associated with the estimated probable recoveries and the probable speed and certainty of closing.  After multiple meetings of the Special Committee, multiple consultations by the Debtor and the Advisors with interested parties, including the Debtors' major creditor constituencies, and final revisions to the terms of the final Ares bid and the MD Investors Bid,

the Special Committee determined that the MD Investors Bid was a higher and better offer for the Debtor Assets than the Aggregate Individual Bids. App. 1436-37. When the Auction reconvened, Ares was invited to submit a competing bid but declined to do so. App. 1437.

At the close of the Auction, the Administrative Agent stated on the record that lenders representing over 97 percent of the outstanding claims and obligations under the Credit Agreement had directed the Administrative Agent to credit bid the full amount of all of the Term Lenders' claims under the Debtors' prepetition term loan facility. App. 1357-58; 1370-71.

Accordingly, the MD Investors Bid included, among other things, the credit bid for substantially all of the Debtors' assets on which the Term Lenders held the highest priority lien (the "Credit Bid Assets") and a cash payment in consideration for certain other assets on which the Term Lenders did not hold the highest priority lien (the "Non-Credit Bid Assets" and together with the Credit Bid Assets, the "Purchased Assets"). App. 1357-58; 1370-71.

### F.   The MD Investors Transaction

On August 7, 2009, the Debtors and MD Investors entered into the Purchase Agreement (the "Purchase Agreement") contemplated by the MD Investors Bid. Under the Purchase Agreement, the Administrative Agent was required to purchase the Credit Bid Assets with the Term Lenders' entire secured interest in the Debtors' assets and assign the Credit Bid Assets to MD Investors.[5] Additionally, MD Investors was required, among other things, to purchase the Non-Credit Bid Assets for $39.5 million in cash and assume up to $8.5 million in administrative

---

[5]      As a result of the credit bid (which left the Term Lenders without a secured interest in the Debtors' assets), the Administrative Agent would release the Term Lenders' liens at the Closing. App. 1425.

claims (for postpetition trade debt and "section 503(b)(9) claims," which are claims for goods shipped prepetition but for which Congress granted administrative claim priority).  App. 1424.[6]

Moreover pursuant to the Purchase Agreement, as consideration for the Creditors' Committee's release of certain potential claims challenging the Term Lenders' liens,[7] MD Investors was required to fund a liquidation trust in the amount of $2.5 million to facilitate the liquidation of the Debtors' remaining assets and to pursue certain claims and causes of action for the benefit of creditors (the "Liquidation Trust").  App. 1425.  The establishment of the Liquidation Trust is, therefore, a payment pursuant to a settlement agreement.  See App. 1084.

### G.  The Sale Hearing

On August 7, 2009, the Debtors submitted a memorandum of law requesting the Bankruptcy Court's authorization for it to enter into the MD Investors Transaction.  BDC was the only party to actively pursue an objection at the hearing to consider the Sale Motions (the "Sale Hearing").  See App. 1003, 1005-06.

Prior to the Sale Hearing, the Debtors submitted declarations from, among others, Michael Kell, a member of the Special Committee, and Michael Macakanja, a representative of the Debtors' investment banking advisors, describing the sale processes and the Auction.[8] Among other things, Mr. Kell testified that the Auction was to be conducted in a manner that was "fair and open" and that it gave all interested parties an opportunity to participate and compete to the fullest extent possible.  App. 1437.  Mr. Kell also testified that multiple recesses were granted to allow the Qualified Bidders to fully evaluate their options and to review, analyze

---

[6]        This cash payment was subject to certain price adjustments, as set forth in sections 2.01, 2.03, 4.05(b) and 4.05(f) of the Purchase Agreement.  App. 1424.

[7]        Specifically, under the DIP Order, the Creditors' Committee retained the right to challenge the validity of the Term Lenders' liens on, among other things, the Mortgages.  Supp. App. 212-14.

[8]        These declarations were admitted into evidence by the Bankruptcy Court as the direct testimony of each witness.  App. 1007.

and respond to competing bids.  App. 1435.  In his Declaration, Mr. Macakanja testified that

multiple recesses were allowed in order for the Debtors, other interested parties and Qualified

Bidders to fully evaluate competing bids for multiple categories of the Debtors' assets that,

because of the complex nature of the Debtors' business and bids for separate groupings of assets,

were not easily compared on an "apples to apples" basis.  App. 1422-24.  Although BDC cross-

examined Mr. Kell, Mr. Macakanja and other witnesses at the Sale Hearing, BDC failed to elicit

any testimony suggesting that the MD Investors Transaction was the product of bad faith,

collusion or fraud.  See App. 1013-59.

At the conclusion of the Sale Hearing, the Bankruptcy Court indicated that it would

approve the sale to MD Investors and, after several days of reviewing the record and the parties'

competing versions of an order, entered the Sale Order and issued the Sale Opinion.  In its

findings of fact, the Bankruptcy Court found that the MD Investors Transaction was, "negotiated,

proposed and entered into by the [Debtors] and MD Investors in good faith, without collusion

and from arm's-length bargaining positions," and that MD Investors was a "good faith purchaser"

under section 363(m) of the Bankruptcy Code.  App. 841 (Sale Order ¶ K).

<u>Argument</u>

**I.      Appellant's Failure to Seek a Stay of the Sale Order Renders Its Arguments
         Equitably and Statutorily Moot.**

The MD Investors Transaction closed on October 16, 2009.  The Debtors intend to file a

motion to dismiss the Appeal based on statutory and equitable mootness in the near future.

**II.     The Sale Order Should Be Affirmed Because the Administrative Agent Was
         Authorized to Credit Bid the Full Amount of the Outstanding Debt Under the Loan
         Documents.**

A.      **The Loan Documents Authorized the Administrative Agent to Credit Bid the Claims of the Term Lenders.**

At the time the Debtors' commenced their chapter 11 cases, the outstanding debt owed under the Loan Documents was approximately $425 million.  Supp. App. 16-17.  The Debtors' obligation to repay that debt was secured by junior liens on the Debtors' inventory and accounts receivable and by senior liens on most (but not all) of the Debtors' other assets.  Supp. App. 17, 20, 22-23.  Pursuant to the Security Agreement, the liens that secured repayment of the term loan debt were granted to the collateral agent, JPMorgan ("Collateral Agent"), "for the ratable benefit of" the Term Lenders.  See App. 1280 (Security Agreement § 2.01).[9]

The commencement of the Debtors' chapter 11 cases was an "Event of Default" under the Loan Documents.  See App. 1256-57 (Credit Agreement § 7.01(i)).  Upon the occurrence of that Event of Default, the Security Agreement granted to the Collateral Agent "the right . . . to exercise any and all rights afforded to a secured party under the Uniform Commercial Code or other applicable law."  App. 1288-90 (Security Agreement § 5.01).

When a debtor conducts an auction under section 363(b) of the Bankruptcy Code to sell some or all of its assets, including the collateral that secures the debtor's prepetition loans, section 363(k) of the Code affords the holder of any claim secured by a lien on such collateral the right to "credit bid" its claim to purchase that property at the auction.  See 11 U.S.C. § 363(k).  The right to credit bid a secured claim at a section 363 sale of the lender's collateral is thus one of the "rights afforded to a secured party" under "other applicable law" as that phrase is used in

---

[9]          JPMorgan serves as both the Collateral Agent under the Security Agreement and the "Administrative Agent" under the Credit Agreement.  Article VIII of the Credit Agreement, which sets forth the general powers and duties of the Administrative Agent, expressly states "that reference in this Article VIII to the Administrative Agent shall be deemed to include the Collateral Agent . . . ."  App. 1259-61 (Credit Agreement, Art. VIII).  Accordingly, for simplicity sake, all references to the Administrative Agent in this Brief are intended to refer to JPMorgan both in its capacity as the Administrative Agent under the Credit Agreement and in its capacity as the Collateral Agent under the Security Agreement.

section 5.01 of the Security Agreement.  Accordingly, pursuant to section 5.01 of the Security

Agreement, JPMorgan, in its capacity as collateral agent, had the right under section 363(k) of

the Bankruptcy Code to credit bid the claims that were secured by the collateral being sold by the

Debtors at the Auction.  See In re GWLS Holdings, Inc., 2009 WL 453110, at *5 (Bankr. D. Del.

Feb. 23, 2009) (provision authorizing collateral agent to exercise rights "of a secured party"

under "any applicable law" includes rights under "the Bankruptcy Code in general, and § 363(k)

in particular," thereby affording collateral agent right to credit bid claims of all the lenders at a

section 363 sale of the collateral); see also App. 978 (Sale Opinion at 13).  BDC has not, and

cannot, cite authority to the contrary.

### B.    BDC "Irrevocably" Authorized the Administrative Agent to Credit Bid BDC's Claim when BDC Entered Into the Credit Agreement.

The underlying premise of every argument that BDC makes in this appeal is that BDC

was a "non-consenting" Term Lender that was improperly "stripped" of its $3.5 million secured

claim by the decision of the Administrative Agent to credit bid the full amount of the claims held

by all of the Term Lenders, including BDC.  (See BDC Brief at 19).[10]  The truth, however, is that

BDC had already consented to the credit bid of its claim by the Administrative Agent when BDC

first acquired that claim.  At that time, BDC executed an "Assignment and Acceptance" form,

pursuant to which BDC became a party to the Credit Agreement and subject to all the obligations

of a "Lender" under that agreement.  See App. 1265-66 (Credit Agreement § 9.04(b)).

Pursuant to the very first paragraph of Article VIII of the Credit Agreement, BDC — as a

Lender under that agreement — "irrevocably  appoint[ed]" the Administrative Agent as BDC's

agent and "authorize[d]" the Administrative Agent to exercise on BDC's "behalf" the powers that

---

[10] Citations to "BDC Brief at [__]" refer to the Amended Brief of Appellant BDC Finance, LLC, filed on October 2, 2009.

are delegated to the Administrative Agent under the Loan Documents, ***including*** the powers

delegated to the Administrative Agent in its capacity as the Collateral Agent under the Security

Agreement:

> Each of the Lenders and the Issuing Bank hereby ***irrevocably appoints*** the Administrative Agent (it being understood that reference in this Article VIII to the Administrative Agent shall be deemed to include the Collateral Agent) ***as its agent*** and ***authorizes*** the Administrative Agent to take such actions ***on its behalf*** and to exercise such powers as are delegated to the Administrative Agent by the terms of the Loan Documents, together with such actions and powers as are reasonably incidental thereto.

App. 1259-61 (emphasis added).  Accordingly, at the time BDC executed the Assignment and

Acceptance form and acquired its secured claim against the Debtors, BDC appointed the

Administrative Agent as BDC's agent and authorized that agent, in the event the Debtors

subsequently commenced chapter 11 cases and offered the collateral securing BDC's claim for

sale at a section 363 auction, to credit bid BDC's claim at that auction, pursuant to the powers

delegated to the agent under section 5.01 of the Security Agreement.  See App. 1259-61.

Because that appointment and authorization was "irrevocable[]", BDC cannot now claim

that it is a "non-consenting" lender that did not authorize the Administrative Agent to credit bid

its claim in the transaction approved by the Sale Order.  See Ind. State Police Pension Trust v.

Chrysler LLC (In re Chrysler LLC), 576 F.3d 108, 120 (2d Cir. 2009) (where original loan

documents authorized collateral trustee to consent to a section 363 sale of lenders' collateral

opposed by certain minority lenders, "under the terms of the various agreements, the minority

lenders could not object to the trustee's actions since they had given their authorization in the

first place").

BDC contends that two other provisions in the Loan Documents should be construed to

prohibit the Administrative Agent from credit bidding BDC's claim without first obtaining

specific written consent from BDC to do so. As detailed below, the Bankruptcy Court properly

rejected BDC's construction of both provisions as erroneous as a matter of law.

> ### 1.     The Provisions of Section 5.01 of the Security Agreement that Govern the Sale of Collateral "by" the Collateral Agent Did Not Require the Agent to Obtain BDC's Consent to the Credit Bid.

BDC contends that a sentence in the second paragraph of section 5.01 of the Security

Agreement — a paragraph that applies to a sale of collateral by the Collateral Agent under the

Uniform Commercial Code — prohibited the Administrative Agent from credit bidding BDC's

claim in this case. (BDC Brief at 16-17). The sentence states:

> At any public (or, to the extent permitted by law, private) sale
> made pursuant to this Section, any Secured Party may bid for or
> purchase . . . the Collateral or any part thereof offered for sale and
> may make payment on account thereof using any claim then due
> and payable to such Secured Party from any Grantor as a credit
> against the purchase price, and such Secured Party may . . . hold,
> retain and dispose of such property without further accountability
> to any Grantor therefor.

App. 1288-90 (Security Agreement § 5.01).

BDC's reliance on this provision to challenge the authority of the Administrative Agent to

credit bid BDC's claim is erroneous as a matter of law for two reasons. First, as the Bankruptcy

Court held, this provision provides authority for any Term Lender to credit bid its claim at an

auction conducted *by the Collateral Agent* under section 9-611 of the Uniform Commercial

Code. By its own terms, it simply does not apply, let alone restrict, the right of the Collateral

Agent to credit bid at an auction conducted *by the Debtors* under section 363 of the Bankruptcy

Code. App. 978 (Sale Opinion at 13).

Second, even if one were to pretend that this provision applied to a section 363 sale

conducted by the Debtors, the construction suggested by BDC is both nonsensical and

completely unsupported by the actual language of the provision. BDC contends that this

sentence should be construed to mean that "the *debt* the Collateral Agent may credit bid is only that which it is authorized to credit bid *by discreet secured creditors bidding their discrete secured debt.*"  (BDC Brief at 16 (emphasis added by BDC)).  BDC's construction is nonsensical because the Collateral Agent would have no reason to credit bid a claim that is already being credit bid by the "discreet" individual holder of that claim.  Moreover, there is ***nothing*** in the language of this provision that purports to prohibit the Collateral Agent from acting "on behalf" of each and every Lender to credit bid all their claims, pursuant to the irrevocable grant of such authority under Article VIII of the Credit Agreement and the first paragraph of section 5.01 of the Security Agreement.

### 2.   Section 9.02(b)(vi) of the Credit Agreement Did Not Require the Agent to Obtain BDC's Consent to the Credit Bid.

BDC argues that because the Sale Order "releases the security interest in unsold collateral" and "does not provide for full payment of the Lenders secured claims," the Sale Order was prohibited by section 9.02(b) of the Credit Agreement, which bars any amendment of the Loan Documents to "(vi) release all or substantially all of the Collateral from the Liens of the Security Documents, without the written consent of each Lender . . . ."  App. 1262-63.  BDC's argument fails because, even though the effect of the Administrative Agent's actions to credit bid the full amount of all outstanding claims under the Loan Documents was to release at the close of the MD Investors Transaction the liens on all the Debtors' assets that secured that debt (including the collateral that was not sold at the Auction), that effect was not the result of an ***amendment*** to the Loan Documents.  Instead, it was the result of the Administrative Agent's exercising its right under the Term Agreement to credit bid the full amount of the debt to purchase most of the Collateral at the Auction — a right already provided for in the Loan Documents in the event of a default by the Debtors.

The construction of a similar provision in <u>Beal Sav. Bank v. Sommer</u>, 8 N.Y.3d 318

(2007) establishes the law of New York on this very point.  In <u>Beal</u>, the New York Court of

Appeals held that a dissenting individual lender could not seek to enforce a credit agreement that

vested in the administrative agent the power "for the enforcement of the Lenders' rights and

remedies."  <u>Id.</u> at 327.  Like BDC here, the dissenting lender in <u>Beal</u> argued that a provision in

the credit agreement — which stated that "no amendment, modification or waiver can be made to

the Loan Documents so as to 'release the Sponsors . . . without the consent of all Lenders'" —

was sufficient to grant the dissenting lender standing to object to the administrative agent's

settlement of all the lenders' claims against a sponsor.  <u>Id.</u> at 330.  The <u>Beal</u> court rejected that

precise argument because the enforcement action "did not release the Trust of its obligations ***by***

***amending, modifying or waiving*** any provision in the agreements."  <u>Id.</u> at 330 (emphasis added).

Holding that the dissenting lender did not have standing to object, the court emphasized the

distinction between an enforcement action already authorized in the credit agreement — there a

settlement — and an amendment to release the sponsor contemplated by the unanimous consent

provision:

> the issue concerns a default and, under the Credit Agreement, even
> if the Settlement has a 'similar effect' to a release, the
> supermajority of Lenders exercised their rights by restructuring the
> debt of a financially troubled Borrower.  Thus, the provisions
> concerning amendment, modification and waiver of the agreements
> do not preclude the Administrative Agent and 95.5% of the
> Lenders from attempting to recover on as much of the Trust's
> obligations as they could.

<u>Id.</u> at 330-31 (citations omitted).

The same construction of a similar provision in the recent decision in <u>GWLS</u>, 2009 WL

453110, is directly on point and dispositive.  In <u>GWLS</u>, a dissenting first lien lender that was

owed $1 million objected to the first lien agent's decision to credit bid the entire $366 million of

outstanding first lien debt to purchase the debtors' assets, pursuant to section 363(k) of the Bankruptcy Code.  Id. at *2-4.  The dissenting lender relied on section 11.1(a) of the credit agreement in that case, which was identical in all material respects to the language in section 9.02(b)(vi) of the Credit Agreement on which BDC relies here:

> 11.1 Amendment and Waiver. . . . no Credit Document nor any terms thereof may be amended, supplemented or modified [except] in accordance with the provisions of this subsection 11.1 . . . (a) no such waiver and no such amendment, supplement or modification shall (i) release all or substantially all of the Collateral . . . without the written consent of *all* Lenders . . . .

Id. at *4-5 (emphasis added by the court).  Section 6.6 of the collateral agreement in GWLS, however,  already authorized the first lien agent to exercise "all rights and remedies of a secured party under New York UCC or any applicable law," id. at *13, much like the virtually identical provision in section 5.01 of the Security Agreement here.  The GWLS court held that the collateral agreement authorized the first lien agent to credit bid under section 363(k) and rejected the dissenting lender's argument that section 11.1(a) of the credit agreement prohibited such action without its consent.  Id. at *13-16.

Critical to the court's analysis was whether the two agreements in that case "came into existence at the same time" and that, because they "are effectively contemporaneous," section 6.6 of the collateral agreement was not a "waiver, amendment, supplement, or modification" of the credit agreement that was contemplated by section 11.1(a) of the credit agreement.  Id. at *12. The court concluded:

> It is abundantly clear, when interpreting both the Credit Agreement and the Collateral Agreement according to the plain meaning of their terms and giving force and effect to all provisions of each agreement, that the provision in the Collateral Agreement which allows the First Lien Agent to enter into the proposed credit bid on behalf of the First Lien Lenders is not overridden by Section 11.1(a) of the Credit Agreement.  Rather, it is only waivers, amendments, supplements, or modifications taking place after the agreements

> were executed . . . that must be made with written consent of all
> the First Lien Lenders.

Id. at *14.  Here, too, the Security Agreement and the Collateral Agreement, from which the

Administrative Agent's authority arose, were executed on the same day as part of the same loan

transaction.

The dissenting secured lenders in the recent section 363 sale of Chrysler's operating

assets also attempted to rely on a virtually identical provision in their first-lien credit agreement

to object to the administrative agent's consent to the sale.  The Chrysler bankruptcy court, relying

on the Beal and GWLS decisions, rejected the dissenting lenders' argument, concluding that the

"purpose of [that provision] is to ensure that unless there is unanimous consent by all lenders

under the related loan agreements, the terms of those agreements cannot be altered in a manner

that is inconsistent with the terms originally agreed to by the parties.  It does not concern

collective action to enforce rights as authorized under the agreed-upon specific provisions of the

parties' loan agreements."  In re Chrysler, 405 B.R. 84, 102-03 (Bankr. S.D.N.Y. 2009) (citation

omitted).  On appeal, the Second Circuit, in a decision that is controlling and binding precedent

in this case, affirmed the bankruptcy court's construction of that provision.  Chrysler, 576 F.3d at

120 ("This clause is no help to the [dissenting lenders].  The § 363(b) Sale did not entail

amendment of any loan document.  To the contrary, the § 363(b) sale was effected by

implementing the clear terms of the loan agreements . . . .  Because the Sale required no

amendment to the loan documents, Chrysler was not required to seek, let alone receive, the

[dissenting lenders]' written consent.").

Thus, *all* courts to date who have construed identical or similar provisions of loan

syndication agreements requiring "unanimous consent" for certain kinds of amendments have

held that such provisions are inapplicable to the exercise of the agent's previously established

enforcement rights with respect to the collateral upon an event of default.  Given the cogent

reasoning of these decisions, and the controlling and binding precedent of the decisions by the

New York Court of Appeals and the Second Circuit on this very point, the Bankruptcy Court

clearly did not err in holding that the Administrative Agent was not required by

section 9.02(b)(vi) of the Credit Agreement to obtain the specific consent of BDC in order to

credit bid BDC's claim at the Auction of the Debtors' assets.

The bottom line in this case is that the Required Lenders — lenders holding more than

97% of the relevant loan amounts — made the collective decision not to settle for the 15%

recovery on their loans that they were likely to receive had the Debtors been forced to accept the

next highest bid for their assets at the Auction.[11]  See App. 1357-58; 1370-71.  Instead, they

made a determination that they could maximize the recovery on their collateral if they bought

those assets through a credit bid at the Auction and then operated the Debtors' business

themselves as a going concern.  The fact that BDC does not agree with that determination and

does not want to participate in the future operation of that going concern does not mean that the

Administrative Agent did not have the authority to credit bid BDC's claim at the Auction.  BDC

granted the Administrative Agent that authority at the time it entered into the Credit Agreement,

and it is bound by that decision now.  See Chrysler, 405 B.R. at 103 ("The [dissenting lenders]

contracted away their right to act inconsistently with the determination of the Required Lenders.

In that regard, if they do not want to waive such rights, they should not have invested in an

investment with such restrictions.  The fact that they do not like the outcome is not a basis to

ignore the governance provisions of the relevant agreements."), aff'd, 576 F.3d 108.

_____

[11]     BDC states that, had the Debtors' accepted the Aggregate Individual Bids, the Term Lenders would have received a 20% return on the value of their interest in the Debtors' assets.  The Debtors' investment banking advisors calculated that the return would have been 15%.  App. 1428 (Macakanja Decl. Ex. 1).

### C.   BDC Is Not Entitled to "Adequate Protection" of any Interest as a Result of the Sale of the Collateral to the Administrative Agent.

BDC claims that the Bankruptcy Court erred in refusing to require the Debtors to provide BDC with "adequate protection" of its secured claim, which it characterizes as a "valuable property interest." (BDC Brief at 13-14). BDC errs for two reasons.

First, BDC did not hold the security interest in the property that the Debtors sold at the Auction pursuant to section 363(b) of the Bankruptcy Code. As noted above, pursuant to the Security Agreement, the liens were granted to and held by the Collateral Agent. See App. 1280 (Security Agreement § 2.01). While the liens were granted "for the ratable benefit of" the Term Lenders, they were granted "to" the Collateral Agent, which is a distinction that deprives the Term Lenders of standing to enforce the liens or seek adequate protection of those interests in these chapter 11 cases. See Bank of Tokyo-Mitsubishi Ltd. v. Enron Corp. (In re Enron Corp.), 2005 WL 356985, at *7 (S.D.N.Y. Feb. 15, 2005) (where collateral was pledged "to" a collateral trustee "for the benefit of" a bank group, bank group did not have standing to proceed against collateral in bankruptcy: "That the grant was made 'for the benefit of' the Bank Group is not sufficient to warrant the conclusion that the parties intended to give the Bank Group standing to proceed individually against the Pledged Collateral. If this were not so, the agreement's distinction between 'to' and 'for the benefit of' would be rendered meaningless, a result that would be inconsistent with well established rules of contract interpretation.").

Second, and in any event, even if one were to construe section 363(e) of the Bankruptcy Code as requiring a debtor to provide adequate protection to the creditors for whose benefit the collateral agent holds the liens on a debtor's property, any such requirement would terminate once the collateral agent releases the liens, which it had every right to do, as was done here under Article VIII of the Credit Agreement. See App. 978.

**D.**   **The Sale Order Does Not Deprive BDC of any Rights It May Have Under the Loan Documents with respect to the Credit Bid Assets.**

BDC's argument that "[n]othing in [the Credit Agreement] authorizes the formation of a new company and the distribution of its equity over the objection of non-consenting secured lenders" is also unavailing.  (BDC Brief at 17).  As the Sale Opinion makes clear, "[n]othing in the [S]ale [O]rder dictates how proceeds from or equity in the purchased assets should be shared among the lenders."  App. 980.  Moreover, to the extent the manner in which proceeds from, or equity in, the Purchased Assets are distributed among the Term Lenders violates the terms of the Credit Agreement, the Sale Order does not prevent BDC from bringing an action against MD Investors, the other Term Lenders or the Administrative Agent.  App. 974.

**III.**   **BDC's Remaining Challenges to the Sale Order Have No Merit.**

In its brief on appeal, BDC asserts three other challenges to the Sale Order:  (1) that the Sale constitutes an impermissible "sub rosa" plan; (2) that the Bankruptcy Court's finding that MD Investors purchased the Debtors' assets in "good faith" was reversible error; and (3) that the entry of the Sale Order deprived BDC of its rights of "due process" under the U.S. Constitution.

**A.**   **BDC Does Not Have Standing To Challenge the Sale Order.**

BDC does not have standing to challenge the Sale on any of these grounds because, as demonstrated above, BDC appointed the Administrative Agent to pursue this transaction on its behalf and agreed to be bound by the actions of its agent when, as here, such actions are taken at the request and direction of the majority of the individual Term Lenders.  See Chrysler LLC, 405 B.R. at 103 (the dissenting lenders "contracted away their right to act inconsistently with the determination of the Required Lenders"), aff'd, 576 F.3d at 108 ("The trustee could take such action only at the direction of the lenders' agent, and the agent could only direct the trustee at the request of lenders holding a majority of Chrysler's debt.  But if those conditions were met — as

they were here — then under the terms of the various agreements, *the minority lenders could not object to the trustee's actions* since they had given their authorization in the first place." (emphasis added)).

Indeed, this Court and others have *repeatedly* held that a dissenting lender does not have standing to object to court approval of a transaction proposed or consented to by the lenders' agent because allowing that lender to assert his objections would undermine "the overall scheme" established by the loan documents that permitted multiple lenders to participate in the loan facility as a group. See, e.g., In re Enron Corp., 302 B.R. 463, 475 (Bankr. S.D.N.Y. 2003), aff'd 04 Civ. 1496, 2005 WL 356985 (S.D.N.Y. Feb. 14, 2005); In re Delta Air Lines, 370 B.R. 537, 548 (Bankr. S.D.N.Y. 2007), aff'd 374 B.R. 516, 528 (S.D.N.Y. 2007); Friedman v. Chesapeake & Ohio Ry. Co., 261 F. Supp. 728, 730 (S.D.N.Y. 1966); Beal, 8 N.Y.3d at 330-31; Credit Francais Int'l S.A. v. Sociedad Financiera de Comercio, C.A., 128 Misc. 2d 564, 582 (Sup. Ct. New York County 1985).[12]

Thus, where, as here, the majority of the group has directed the group's agent to take action on behalf of the group, the overall scheme and purpose of the provisions in the loan agreements authorizing the agent's action requires that a court deny standing to a dissenting member of the group to challenge the agent's actions. As the bankruptcy court in Chrysler concluded, in language relied upon by the Bankruptcy Court in this case:

---

[12]     In Chrysler, for example, the collateral trustee for the first-lien lenders had consented to a sale of the collateral to a buyer and dissident lenders also attempted to challenge that sale by arguing, among other things, that the use of TARP money to finance the transaction was illegal under federal law.  The Second Circuit held that the dissident lenders did not have standing to make that argument because they had not suffered "injury in fact" from the use of TARP funds.  The Second Circuit then noted, however, that "even if [the dissident lenders] could demonstrate injury in fact, there would still be a question as to whether they have standing to challenge the use of TARP funds here.  Under the terms of the various agreements (as outlined in Section II), the lenders had authorized the trustee to consent to the Sale on their behalf.  Under those circumstances (and well-established agency principles), such consent may bar the [dissident lenders] from challenging the trustee's actions and litigating a claim that would in effect bind all of the first-lien creditors." Chrysler, 576 F.3d at 123.

> [T]he purpose of the relevant provisions [in the loan documents] is
> to have the Administrative Agent and Collateral Trustee act in the
> collective interest of the lenders.  Restricting enforcement to a
> single agent to engage in unified action for the interests of a group
> of lenders, based upon a majority vote, avoids chaos and prevents a
> single lender from being preferred over others.

Chrysler, 405 B.R. at 103 (citing In re Enron Corp., 302 B.R. at 475); see also App. 977 (Sale

Opinion at 12 n.10).

### B.   Even If Appellant had Standing To Challenge the Sale Order, Its Arguments Fail on the Merits.

Even if BDC had standing to challenge the Sale, which it does not, this Court should

affirm the Sale Order because of each of BDC's remaining legal challenges lack merit.

#### 1.   Sub Rosa Plan

BDC argues that the MD Investors Transaction is an "impermissible sub rosa plan"

because the transaction contemplates "distributions" in satisfaction Debtors' chapter 11

professionals fees and unsecured claims as well as the release of the Term Lenders' liens on

unsold assets.  (BDC Brief at 18-19).  To the contrary, there is no evidence in the record

suggesting that the Sale Order constitutes a sub rosa plan.

In particular, with regard to the release of the Term Lenders' liens on the Debtors' unsold

assets, those releases result from the fact that the Collateral Agent's credit bid extinguished the

Term Lenders' entire secured interest in the Debtors' assets.  The release of the liens, therefore,

merely reflects the reality that, without a secured interest in the Debtors' assets, the Term

Lenders (including BDC) cannot maintain liens on the Debtors' property.

Moreover, with regard to the amount paid to establish the Liquidation Trust, that amount

is merely consideration for Creditors' Committee's release of potential claims against the Term

Lenders' Liens, not a distribution on account of the unsecured creditors' claims.  See Supp.

App. 186; App. 1084.

Finally, with regard to the alleged "distributions" for "professional fees", BDC's claim is misleading.  The $8.5 million amount *for assumed liabilities* is earmarked for administrative claims for trade debt, not, as BDC claims, for satisfaction of amounts owed to the Debtors' bankruptcy professionals.  App. 877.  Such assumption of liabilities associated with the business a buyer purchases are typical in any sale pursuant to section 363(b) and ***do not*** constitute "distributions" to junior creditors or violate the absolute priority rule.

### 2.    <u>Good Faith</u>

Without a single citation to the factual record, BDC alleges that that MD Investors is not a good faith purchaser because its bid "***appear[s]***" to have been "fashioned for the purpose of squeezing-out a dissident [and is] a comprehensive attempt at ambush."  (BDC Brief at 20 (emphasis added)).  Based on this unsupported assertion, BDC argues that the Court should overturn the Bankruptcy Court's finding that MD Investors was a good-faith purchaser; however, nothing in the record justifies such a determination.

Although the term "good-faith purchaser" is not defined in the Bankruptcy Code, good faith is shown by the "integrity of [the purchaser's] conduct during the course of the sale proceedings."  <u>In re Gucci</u>, 126 F.3d 380, 390 (2d Cir. 1997); <u>see also</u> <u>Bay Harbour Mgmt., L.C. v. Lehman Bros. Holdings, Inc. (In re Lehman Bros. Holdings, Inc.)</u>, 2009 WL 667301, at *6 (S.D.N.Y. Mar. 13, 2009).  Courts generally find that a transaction was not in good faith, "where a purchaser engaged in fraud, collusion . . . or attempt[ed] to take grossly unfair advantage of the other bidders."  <u>Lehman</u>, 2009 WL 667301, at *6.

Here, the unrebutted testimony of the Debtors' witnesses at the Sale Hearing as well as the transcript from the Auction illustrate that the sale of the Debtors' assets was conducted in a manner that was "fair and open," and that all interested parties were given an opportunity to participate and compete to the fullest extent possible.  App. 1435-1437.  The Debtors considered

every submitted bid, and determined, based on the advice of their financial and legal advisors and those of the Special Committee, that the MD Investors Transaction was the highest bid in the best interest of their estates.  App. 1436-37.

Based on this evidence, the Bankruptcy Court concluded that the MD Investors Transaction, "was entered into by [Metaldyne] and MD Investors in good faith, without collusion and from arm's-length bargaining positions," and therefore, "MD Investors is a 'good faith purchaser' within the meaning of section 363(m) . . . ."  App. 841 (Sale Order ¶ K).  Simply because BDC asserts in its Brief that the Debtors and MD Investors worked together to exclude other bids does not make it true.  See Lehman, 2009 WL 667301, at *6 ("Appellants' speculation [of bad faith] is insufficient to show that the court's conclusion was clearly erroneous.").  Accordingly, BDC has not satisfied its "heavy burden" to show that the Bankruptcy Court's finding of good faith was clearly erroneous.  Id.

### 3.    Due Process

Lastly, BDC claims that its due process rights were violated by the Debtors because the terms of the final bid were released to BDC without enough time to review it before the Sale Hearing (BDC Brief at 21-22).  This argument fails for two reasons.  First, as described above, under the terms of the Loan Agreement, the Collateral Agent, and not BDC, holds the property interest in the Term Lenders' collateral.  Without a property interest, BDC's due process rights could not have been implicated.  See Am. Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 59-61 (1999).

Moreover, even if BDC had a property interest in a ratable portion of the Term Lenders' collateral, it authorized the Administrative Agent to bid on its behalf.  It is uncontested that throughout the bidding process, adequate notice and procedures were undertaken with respect to

JPMorgan in its role as Administrative Agent.[13]  Thus, BDC's due process rights were not violated.  See Lehman, 2009 WL 667301, at *8 n. 7.

### Conclusion

For the foregoing reasons, the Debtors request that the Court affirm the Sale Order.

Dated: New York, New York
October 19, 2009

Respectfully submitted,

s/ Michael D. Silberfarb
Michael D. Silberfarb
Jones Day
222 East 41st Street
New York, New York  10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306


Heather Lennox
Robert W. Hamilton
Ryan T. Routh
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212

ATTORNEYS FOR THE DEBTORS

---

[13]     BDC was involved in the Sale Processes and was presented with the same materials that were distributed to the other lenders days before the Sale Hearing.  See App. 1000.  In fact, the Bankruptcy Court scolded BDC for making this same argument because it prepared and filed an objection to the MD Investors Transaction days before the Sale Hearing.  See App. 1098.