**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| Metaldyne Corporation, et al., | Case No. 09-13412-mg |
| Debtors. | (Jointly Administered) |
| BDC FINANCE, L.L.C., | |
| Appellant, | Dist. Ct. Case No. 09-cv-07897-DLC |
| v. | |
| METALDYNE CORPORATION, *et al.*, MD INVESTORS CORPORATION | |
| Appellees. | |

# BRIEF OF APPELLEE
## THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS
## OF METALDYNE CORPORATION, *et al.*

Dated:  October 19, 2009

**REED SMITH LLP**
Mark D. Silverschotz
599 Lexington Avenue
22nd Floor
New York, NY 10022
Telephone: (212) 521-5400
Facsimile: (212) 521-5450
Email: msilverschotz@reedsmith.com

-and-

Kurt F. Gwynne
Mark W. Eckard
1201 N. Market Street; Suite 1500
Wilmington, DE 19801
Telephone: (302) 778-7500
Facsimile: (302) 778-7575
Email: kgwynne@reedsmith.com
Email: meckard@reedsmith.com

## Table of Contents

**Page**

I.    PRELIMINARY STATEMENT .............................................................................1

II.   STATEMENT OF FACTS ..................................................................................3

     A.    The Prepetition Secured Term Loan Facility.........................................3

     B.    The Final DIP Order and the Reservation of The Estates' Objections
         to the Agent's Liens .............................................................................4

     C.    The Lenders' Delegation of Authority to the Agent ...............................6

     D.    The Auction and the Sale ......................................................................7

     E.    BDC's Appeal .....................................................................................9

III.  STANDARD OF REVIEW ...............................................................................9

IV.  ARGUMENT ...................................................................................................10

     A.    The Agent Was Authorized by the Credit Agreement and the Security
         Agreement to Credit Bid .....................................................................10

         1.    Article VIII of the Credit Agreement and Section 5.01 of the
              Security Agreement Authorize the Agent's Credit Bid ...........................11

         2.    The Agent's Credit Bid Did Not Effect an Amendment of the
              Credit Agreement or the Security Agreement ...........................17

         3.    BDC Does Not Have a Right to Adequate Protection ..............................18

     B.    The Sale Does Not Constitute a Sub Rosa Chapter 11 Plan or Violate
         the Priority Scheme of the Bankruptcy Code .........................................19

     C.    MDI is a Good Faith Purchaser Pursuant to Section 363(m) of the
         Bankruptcy Code ...............................................................................20

     D.    BDC's Constitutional Rights were Not Violated....................................22

V.    CONCLUSION..................................................................................................24

## Table of Authorities

### Cases

Babbitt v. Vebeliunas (In re Vebeliunas),
   332 F.3d 85 (2d Cir. 2003) ............................................................................ 9

Bay Harbour Mgmt., L.C. v. Lehman Bros. Holdings, Inc. (In re Lehman Bros. Holdings, Inc.),
   2009 WL 667301 (S.D.N.Y. March 13, 2009) ....................................... 22

Beal Sav. Bank v. Sommer,
   865 N.E.2d 1210 (N.Y. 2007) .................................................................. 18

Boyer v. Gildea,
   374 B.R. 645 (N.D. Ind. 2007) ................................................................ 21

Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.),
   722 F.2d 1063 (2d Cir. 1983) .................................................................. 20

Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.,
   508 U.S. 602 (1993) .................................................................................. 10

Greenfield v. Philles Records, Inc.
   98 N.Y.S.2d 562 (NY 2002) .................................................................... 10

Gulf States Exploration Co. v. Manville Forest Prods. Corp.,
   896 F.2d 1384 (2d Cir. 1990) .................................................................. 10

In re Chrysler LLC,
   576 F.3d 108 (2d Cir. 2009) ............................................................. passim

In re Coudert Bros. LLP,
   2009 WL 2868722 (S.D.N.Y. Sept. 4, 2009) ......................................... 10

In re Enron Corp.,
   302 B.R. 463 (Bankr. S.D.N.Y. 2003),
   aff'd 2005 WL 356985 (S.D.N.Y. Feb. 14, 2005) ................................. 15

In re Glance,
   487 F.3d 317 (6th Cir. 2007) ................................................................... 14

In re Gucci,
   126 F.3d 380 (2d Cir. 1997) .................................................................... 22

In re GWLS Holdings, Inc.,
   2009 WL 453110 (Bankr. D. Del. Feb. 23, 2009) ................... 11, 12, 17, 18

In re Hall's Motor Transit Co.,
   889 F.2d 520 (3d Cir. 1989) .................................................................................. 16

In re Hernandez,
   75 B.R. 962 (N.D. Ill. 1994) ................................................................................. 14

In re Jiminez,
   2008 WL 2026147 (Bankr. S.D.N.Y. May 9, 2008) .............................................. 14

In re Metaldyne Corp.,
   409 B.R. 671 (Bankr. S.D.N.Y. 2009) ............................................................ passim

In re Ocean Blue Leasehold Property LLC,
   --- B.R. ---, 2009 WL 1117400 (Bankr. S.D.Fla. Apr. 23, 2009) ......................... 18

In re Orfa Corp. of Philadelphia,
   170 B.R. 257 (Bankr. E.D. Pa. 1994) ...................................................................... 7

In re Pink Cadillac Assocs.,
   1997 WL 164282 (S.D.N.Y. Apr. 8, 1997) ............................................................. 7

In re Sneijder,
   407 B.R. 46 (S.D.N.Y. 2009) ................................................................................ 14

In re Spillman Dev. Group, Ltd.,
   401 B.R. 240 (Bankr. W.D.Tex. 2009) ................................................................. 18

Italian Colors Rest. v. Am. Express Travel Related Servs. Co. (In re Am. Express Merchants'
   Litig.),
   554 F.3d 300 (2d Cir. 2009) .................................................................................. 10

Johnson [v. Home State Bank,
   501 U.S. 78 (1991)] ............................................................................................... 14

Lone Star Indus., Inc. v. Compania Naviera Perez Companc (In re New York Trap Rock Corp.),
   42 F.3d 747 (2d Cir. 1994) .................................................................................... 21

McInerney v. Tang,
   5 F.3d 537 (Table), 1993 WL 312763 (9th Cir. Aug. 18, 1993) ............................. 18

Motorola v. Comm. of Unsecured Creditors (In re Iridium Operating LLC),
   478 F.3d 452 (2d Cir. 2007) .................................................................................. 20

Pennsylvania Dep't of Public Welfare v. Davenport,
   495 U.S. 552 (1990) ............................................................................................... 14

RMM Records & Video Corp. v. Universal Music Video Distrib. Corp.,
   372 B.R. 619 (Bankr. S.D.N.Y. 2007) ................................................................... 10

**Statutes**

11 U.S.C. § 101(12) ................................................................................................... 14

11 U.S.C. § 101(37) ................................................................................................... 14

11 U.S.C. § 101(5)(A) ................................................................................................ 14

11 U.S.C. § 363(k) ..................................................................................................... 18

11 U.S.C. § 363(m) .................................................................................................... 21

11 U.S.C. § 363(n) ..................................................................................................... 21

11 U.S.C. § 506(c) ....................................................................................................... 5

11 U.S.C. § 547(b) ....................................................................................................... 5

11 U.S.C. § 550 ........................................................................................................... 5

11 U.S.C. § 551 ........................................................................................................... 5

11 U.S.C. § 552 ........................................................................................................... 5

11 U.S.C. §§ 363-64 .................................................................................................... 4

**Other Authorities**

Webster's Third New International Dictionary 446 (G. & C. Merriam Co. 1976 ed.)................ 21

**Rules**

Fed. R. Bankr. P. 8013 ........................................................................................... 9, 22

## I.   **PRELIMINARY STATEMENT**

The Debtors' sale (the "Sale") of a majority of their assets (the "Assets") to MD Investors Corporation ("MDI") closed on Friday October 16, 2009.[1]  At a time when the automotive industry is in turmoil, the Sale maximized recoveries for the Debtors' creditors and preserved the value and viability of the Debtors' core businesses for the benefit of employees, customers and vendors.  The Official Committee of Unsecured Creditors of Metaldyne Corporation *et al.* (the "Committee"), as a fiduciary for the Debtors' unsecured creditors, supported the Sale.

Appellant BDC Finance, LLC ("BDC") is among a group of secured creditors that irrevocably delegated authority to JPMorgan Chase Bank, N.A., as administrative agent and collateral agent (the "Agent"), to act for and on behalf of the secured creditors.  Pursuant to that authority, and on behalf of all of such lenders, including BDC, the Agent (i) "credit bid" the full amount owing to the secured creditors in exchange for certain of the Assets and then (ii) disposed of the Assets with the consent of holders of 97% of such outstanding secured debt.

Apparently, BDC has chosen not to participate in MDI, the entity established by its fellow secured lenders to hold the Assets.  Instead, MDI seeks to "hold up" its fellow lenders and the Debtors' bankruptcy estates (the "Estates") by seeking treatment that no other similarly-situated secured creditor has received (or is entitled to).  To that end, BDC challenges its Agent's credit bid and argues as if BDC still holds a secured claim.  As a matter of law, however, the Agent's duly-authorized credit bid of the ***full*** amount due to the secured lenders (including BDC) satisfied the entire amount owed to the secured lenders (including BDC).  Thus, BDC has no secured claim.

---

[1] The recent closing of the Sale renders this appeal statutorily and equitably moot.  The Committee intends to file a separate motion to dismiss this appeal on such grounds.

As part of the Sale, MDI paid certain of the Debtors' administrative expense claims and will make a $2.5 million payment to a liquidation trust upon the effective date of confirmation of a chapter 11 plan.  Importantly, those funds are *not* the proceeds of the Agent's collateral and were *never* available to BDC (or its fellow secured lenders).  Those payments were made from MDI's funds.  A significant portion of those funds was required to pay the claims of other secured creditors with a first priority lien on the Debtors' working capital assets that MDI sought to purchase.  The remaining funds were paid to satisfy administrative expense claims or to resolve the Estates' challenges and objections to the Agent's asserted liens against certain of the Debtors' property.  Absent the resolution of those challenges and objections, the amount of the secured debt that the Agent could have credit bid was uncertain because its liens were disputed. MDI's payment of *its own funds* to resolve the Estates' challenges and objections enabled the Agent to credit bid the full amount of its secured claim.  Accordingly, nothing about the Sale violates the priority scheme of the Bankruptcy Code, and none of the proceeds of BDC's collateral was distributed to "junior" creditors.

Contrary to BDC's assertion, the Sale does not improperly dictate *any* terms of a chapter 11 plan.  MDI is required to pay $2.5 million to a liquidating trust on the effective date of confirmation of a chapter 11 plan.  The Sale does not dictate the terms of any such plan. It simply requires that MDI provide certain funds to unsecured creditors once a confirmed plan (whatever its terms) becomes effective.

BDC's arguments in this appeal are based upon its mischaracterizations of the facts and its attempt to disclaim the authority that BDC irrevocably delegated to its collateral Agent. BDC's arguments lack merit.  Accordingly, the Bankruptcy Court's approval of the Sale should be affirmed.

II.     **STATEMENT OF FACTS**

    A.     **The Prepetition Secured Term Loan Facility**

On May 27, 2009 (the "<u>Petition Date</u>"), the Debtors filed their chapter 11 bankruptcy petitions.  Prior to the Petition Date, certain of the Debtors, the Agent (as collateral and administrative agent), other lending institutions as syndication and documentation agents, and the lender parties thereto (collectively, the "<u>Lenders</u>") entered into a Credit Agreement, dated as of January 11, 2007 (as amended or restated, the "<u>Credit Agreement</u>").  Pursuant to the Credit Agreement, the Lenders extended terms loans (the "<u>Term Loan Facility</u>") to certain of the Debtors.  As of the Petition Date, certain of the Debtors admitted that they were indebted under the Term Loan Facility in the approximate amount of $466,334,112.  <u>See</u> Comm. App. 983-84 (Final DIP Order at ¶ G(ii) (pp. 16-17)).

To secure the Debtors' obligations incurred under the Credit Agreement, certain of the Debtors and the Agent entered into a Security Agreement dated January 11, 2007 (the "<u>Security Agreement</u>").  <u>See</u> BDC App. 1276 and 1297.  Pursuant to the Security Agreement, certain of the Debtors granted the *Agent* a first-priority security interest in "hard assets" (such as equipment and fixtures) and first-priority mortgages on certain real property.  In addition, during the ninety days prior to the Petition Date, the Debtors recorded five mortgages in favor of the Agent on real property located in (i) Bluffton, Indiana; (ii) Hamburg, Michigan; (iii) Litchfield, Michigan; (iv) Ridgway, Pennsylvania; and (v) Saint Mary's, Pennsylvania (the "<u>Preferential Mortgages</u>").

The Agent also held a first priority security interest in approximately 65% of the Debtors' stock in its foreign subsidiaries.  The remainder of those equity interests was unencumbered (the "<u>Unencumbered Stock</u>"), and its value was available for unsecured creditors.

As of the Petition Date, the Debtors also owed approximately $36 million to a separate group of lenders (the "ABL Lenders") pursuant to an asset-based loan facility. See Comm. App. 982-83 (Final DIP Order at ¶ G(i) (p. 15-16)). The ABL Lenders held a first-priority security interest in the Debtors' working capital assets (such as inventory and accounts receivable). The Agent held a second-priority security interest in those working capital assets.

**B.    The Final DIP Order and the Reservation of the Estates' Objections to the Agent's Liens.**

Under the Bankruptcy Code, a debtor in possession cannot use a prepetition secured creditor's cash collateral or obtain post-petition financing without bankruptcy court approval. See 11 U.S.C. §§ 363-64. Accordingly, on June 23, 2009, the Bankruptcy Court entered a Final Order Pursuant to Sections 361, 362, 363, 364 and 510 of the Bankruptcy Code and Rule 4001 of the Federal Rules of Civil Procedure (A) Authorizing the Debtors to (I) Use Cash Collateral of the Prepetition Secured Lenders, (II) Obtain Postpetition Financing and (III) Provide Adequate Protection to the Prepetition Secured Lenders and (B) Authorizing Debtors to Enter Into and, Approving, an Accommodation Agreement with Certain Customers. See Comm. App. 968-1028 (the "Final DIP Order").

In the Final DIP Order, the Debtors made a number of admissions regarding the claims and rights of the Lenders. See, e.g., Comm. App. 968-991. Pursuant to Paragraph 6 of the Final DIP Order, however, the Court preserved the Committee's rights (on behalf of the Estates) to (a) object to or challenge any and all findings of the Final DIP Order, including, but not limited to, findings in relation to (i) the validity, extent, perfection or priority of the Agent's liens, or (ii) the validity, allowability, priority, status or amount of the obligations owed under the Credit Agreement, or (b) to bring suit against the Agent in connection with or related to the obligations owed under the Credit Agreement. See Comm. App. 1006-1008 (Final DIP Order at ¶ 6). This

preservation of rights included, among other things, the Committee's right to avoid the Preferential Mortgages.  <u>See</u> Comm. App. 1007.  Moreover, the Final DIP Order did not include a waiver of the Estates' rights under Section 506(c) of the Bankruptcy Code to surcharge the Agent's collateral for the expenses of preserving and disposing of that collateral.  <u>Id.</u>  The Final DIP Order also preserved the Committee's argument to limit the Agent's liens under the "equities of the case" exception under Section 552(b) of the Bankruptcy Code.  <u>See</u> Comm. App. 1025 (Final DIP Order at ¶ 18(g)).

Pursuant to the Final DIP Order, the Unencumbered Stock also would remain available to unsecured creditors unless the Agent could prove that the value of its liens was diminished as a result of the $19.9 million in DIP financing.  <u>See</u> Comm. App. 1001 (Final DIP Order at ¶ 4(b)).  Just prior to the Auction (as defined below), MDI requested a court finding that the DIP financing diminished the value of the Agent's liens thereby entitling the Agent to credit bid the value of the otherwise Unencumbered Stock.  <u>See</u> Reply of MDI, Relating to Emergency Motion of MDI (Docket No. 597), Seeking Clarification Regarding the Court's Opinion Approving the DIP Facility, dated June 23, 2009 [D.I. 610].  The Debtors and the Committee opposed MDI's request for such a finding, and the Court made no such finding.

Thus, at the time of the Auction, the Committee and the Estates retained significant challenges and objections the Agent's liens, including the right to surcharge the collateral proceeds for the costs of the sale process under Section 506(c), the right to avoid the Preferential Mortgages under Sections 547, 550 and 551, the right to limit the Agent's liens based on the equities of the case under Section 552, and the right to the Unencumbered Stock was so long as the Agent was unable to demonstrate that the DIP financing diminished the value of the Agent's lien.  <u>See generally</u> 11 U.S.C. §§ 506(c), 547(b), 550, 551 and 552.

C.      **The Lenders' Delegation of Authority to the Agent**

Pursuant to the Credit Agreement, each of the Lenders, including BDC, irrevocably

delegated to their Agent broad powers and authority to act on behalf of the Lenders.  Article VIII

of the Credit Agreement provides, in pertinent part:

> Each of the Lenders and the Issuing Bank hereby irrevocably
> appoints [the Agent] as its agent and authorizes [the Agent] to take
> such actions on its behalf and to exercise such powers as are
> delegated to [the Agent] by the terms of the Loan Documents,
> together with such actions and powers as are reasonably incidental
> thereto.

See BDC App. 1259.  The Security Agreement is one of the "Loan Documents" referred to in

Article VIII of the Credit Agreement.  See BDC App. 1185.

The Security Agreement provides that, upon the occurrence of an event of default under

the Credit Agreement,[2] the Agent had broad authority to "exercise any and all rights afforded to

a secured party under the Uniform Commercial Code or other applicable law."  See BDC App.

1288 (Security Agreement § 5.01).  The Lenders also delegated to the Agent the "right . . . to sell

or otherwise dispose of all or any part of the Collateral . . . for cash, upon credit or future

delivery as [the Agent] shall deem appropriate."  See BDC App. 1288-89 (Security Agreement

§ 5.01).

The Security Agreement further provides that "any Secured Party may bid for or

purchase . . . the Collateral or any part thereof offered for sale and may make payment on

account thereof by using any claim then due and payable to such Secured Party."  See BDC App.

1289 (Security Agreement § 5.01).  The Agent is a "Secured Party" under the Security

Agreement.  See BDC App. 1279 (Security Agreement § 1.01) (defining "Secured Parties" to

---

[2] The Debtors' filing of their bankruptcy petitions constitutes and event of default under Section 7.01(i) of the Credit
Agreement.  See BDC App. 1256.

include, *inter alia*, the Agent (referred to therein as both the "Administrative Agent" and the "Collateral Agent")).  Thus, the Lenders also expressly authorized the Agent to credit bid for the Assets.

        **D.**      **The Auction and the Sale**

The Debtors conducted an auction on August 5 and 6, 2009 (the "Auction").  At the conclusion of the Auction, which entailed arduous, lengthy negotiations, MDI emerged as the successful bidder for the Assets.  The main subject of those negotiations was the amount that the Agent would be entitled to credit bid given that (i) its liens included the Preferential Mortgages avoidable under Section 547, (ii) the proceeds of the Agent's collateral were subject to surcharge under Section 506(c), (iii) the Agent's liens were subject to limitation based on the equities of the case, and (iv) the value of the Agent's liens was not diminished as a result of the DIP financing so the Unencumbered Stock remained available to the unsecured creditors.

Of particular concern to the Committee was the fact that, if the Agent's credit bid was deemed the successful bid, the Estates' right to surcharge the Agent's collateral for the costs and expenses of selling the collateral would be lost.  The right to surcharge collateral is limited to the proceeds of such collateral.  In the context of a credit bid, there are no cash proceeds.  Consequently, a lender has no liability for the costs and expenses of sale if there are no proceeds from its collateral.[3]  Accordingly, at the Auction, in order to determine (i) the amount the Agent could credit bid and (ii) whether competing cash sales (even at lower bid amounts) benefitted

---

[3] See In re Pink Cadillac Assocs., 1997 WL 164282, at *6 (S.D.N.Y. Apr. 8, 1997) ("Section 506(c) therefore gives the Trustee no right to seek compensation directly from the secured creditor."); In re Orfa Corp. of Philadelphia, 170 B.R. 257, 274 (Bankr. E.D. Pa. 1994) ("the liability of a secured creditor under § 506(c) is limited to a surcharge against its collateral or the proceeds therefrom . . . . Section 506(c) allows a trustee to "recover *from property* securing an allowed secured claim.").

other constituents more than the Agent's credit bid, the Debtors were required to quantify or resolve issues regarding the Agent's liens.

Following lengthy negotiations, the Debtors and the Committee agreed that the Agent could credit bid the *full amount* of the Lenders' secured claim provided that (i) MDI paid $39.5 million in cash (subject to certain adjustments); (ii) MDI assumed $8.5 million in administrative priority claims, and (iii) MDI escrowed $2.5 million in cash for distribution to a liquidating trustee upon the effective date of confirmation of a chapter 11 plan.  See BDC App. 857 (Final Sale Order at ¶¶ 29 and 30).  In exchange for those concessions, the Committee and the Debtors agreed to waive (i) the Estates' right to avoid the Preferential Mortgages, (ii) the Estates' right to surcharge the Lenders' collateral under Section 506(c) of the Bankruptcy Code, and (iii) all claims based on the "equities of the case" exception in Section 552 of the Bankruptcy Code. In exchange for MDI's substantial payments, the Debtors and the Committee also agreed to provide MDI a participatory interest in one-half of the value of the Debtors' remaining assets even though they were unencumbered after the Agent credit bid the full amount of the Lenders' secured claim.

After the resolution of the Estates' and the Committee's rights to challenge or surcharge the Agent's secured claim, and at the direction of 97% of the Lenders, the Agent credit bid the *full amount* of its secured claim for the Assets.  As stated by the Bankruptcy Court:

> The final MDI bid was almost $70 million more in value than the combined stalking horse bids, and $27 million more than the combined next highest bids on the Debtors' individual business units.  The final MDI bid consisted of $39.5 million in cash (subject to certain adjustments), assumption of $8.5 million in administrative priority claims, $2.5 million in cash to fund a litigation trust for the Creditors' Committee, assumption of a $15 million note, and most critically in this case, a credit bid of all of the senior secured term loan debt, in an amount not less than $425

million and the release of liens on any assets that are not included
in the sale.

In re Metaldyne Corp., 409 B.R. 671, 674 (Bankr. S.D.N.Y. 2009)   For the reasons indicated by

the Bankruptcy Court, with the Agent's credit bid of the full amount of the Lenders' secured

claims, MDI's bid was the highest and best offer for the Assets.

After a hearing on August 7, 2009, the Bankruptcy Court entered an order approving the

Sale.  See BDC App. 836-965 (the "Sale Order").

      **E.**    **BDC's Appeal**

BDC appeals the Sale Order on five theories.  BDC claims that (i) Section 363 of the

Bankruptcy Code did not authorize the Sale; (ii) the Agent was not authorized by the relevant

loan documents to credit bid; (iii) the Sale constituted a *sub rosa* plan of reorganization;

(iv) MDI's bid violated the good-faith requirement of Section 363(m) of the Bankruptcy Code;

and (v) BDC's constitutional rights were violated by the pace of the Auction and Sale.

In presenting its appeal, BDC barely makes passing reference (in footnote 9 of its brief)

to the relevant and controlling language of the Credit Agreement and Security Agreement.

Instead, BDC mischaracterizes basic facts and ignores other inconvenient facts that undermine

the foundation of its appeal.

## III.    **STANDARD OF REVIEW**

A bankruptcy court's conclusions of law are reviewed *de novo* and its findings of fact are

reviewed for clear error.  See Fed.R.Bankr.P. 8013 (bankruptcy court's findings of fact, "whether

based on oral or documentary evidence, shall not be set aside unless clearly erroneous"); In re

Chrysler LLC, 576 F.3d 108, 113 (2d Cir. 2009) (citing Babbitt v. Vebeliunas (In re Vebeliunas),

332 F.3d 85, 90 (2d Cir. 2003)).  The Second Circuit has stated that, under the clear-error

standard, a bankruptcy court should only be reversed if the appellate court is "left with the

definite and firm conviction that a mistake has been committed." Gulf States Exploration Co. v. Manville Forest Prods. Corp., 896 F.2d 1384, 1388 (2d Cir. 1990); see also Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal., 508 U.S. 602, 623 (1993) (The clear-error standard is "significantly deferential.").  Mixed questions of law and fact are reviewed "either de novo or under the clearly erroneous standard depending on whether the question is predominantly legal or factual." Italian Colors Rest. v. Am. Express Travel Related Servs. Co. (In re Am. Express Merchants' Litig.), 554 F.3d 300, 316 n. 11 (2d Cir. 2009); In re Coudert Bros. LLP, 2009 WL 2868722, at *3 (S.D.N.Y. Sept. 4, 2009) (quoting Italian Colors Rest.).

## IV.   ARGUMENT

### A.   The Agent Was Authorized by the Credit Agreement and the Security Agreement to Credit Bid.

Pursuant to the plain language of the Credit Agreement and Security Agreement, the Agent was authorized and empowered to credit bid the full amount of the Lenders' secured claims at the Auction.  The plain language of those agreements must be enforced as written. See RMM Records & Video Corp. v. Universal Music Video Distrib. Corp., 372 B.R. 619, 622 (Bankr. S.D.N.Y. 2007) ("In New York, it is well-settled that a 'written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms.'") (quoting Greenfield v. Philles Records, Inc. 98 N.Y.S.2d 562, 569 (NY 2002)).[4]

---

[4] The Credit Agreement and the Security Agreement are governed under New York Law.  BDC App. 1269 and 1293 (Credit Agreement § 9.09(a) and Security Agreement § 6.07).

1.    **Article VIII of the Credit Agreement and Section 5.01 of the Security
Agreement Authorize the Agent's Credit Bid**

Pursuant to Article VIII of the Credit Agreement, the Lenders, including BDC,
"irrevocably" appointed the Agent as their collateral and administrative agent and authorized the
Agent to "exercise such powers as are delegated to [the Agent] by the terms of the Loan
Documents, together with such actions and powers as are reasonably incidental thereto." See
BDC App. 1259 (Credit Agreement Art. VIII). Pursuant to Section 5.01 of the Security
Agreement, the Lenders delegated to the *Agent* the authority to "exercise any and all rights
afforded to a secured party under the Uniform Commercial Code *or other applicable law*." See
BDC App. 1279 and 1289 (Security Agreement §§ 1.02 and 5.01) (emphasis added). One such
right that a secured party may exercise under "other applicable law" (here, the Bankruptcy Code)
is the right to credit bid for its collateral under Section 363(k). Therefore, BDC (together with
the other Lenders) specifically delegated to *its* Agent the authority to credit bid for the collateral
securing the claims of the Lenders, including BDC.

Section 5.01 of the Security Agreement further provides that, "[w]ithout limiting the
foregoing, each [Lender] agrees . . . that the Collateral Agent shall have the right . . . to sell or
otherwise dispose of all or any part of the Collateral . . . for cash, upon credit or future delivery
as the Collateral Agent shall deem appropriate." See BDC App. 1288-89 (Security Agreement
§ 5.01). Thus, BDC also specifically delegated to the Agent the authority to "sell or otherwise
dispose of *all* or any part of the Collateral." See BDC App. 1289. The Agent, with the authority
delegated to it *by BDC* (and the other Lenders), credit bid the full amount of the Lenders'
secured claims and disposed of the collateral pursuant to the Sale.

In In re GWLS Holdings, Inc., 2009 WL 453110 (Bankr. D. Del. Feb. 23, 2009), the
court held that language very similar to Article VIII of the Credit Agreement and Section 5.01 of

the Security Agreement authorized an agent to credit bid over the objection of a dissenting

creditor.  In GWLS, the debtors sought to sell substantially all of their assets to a group of

lenders whose $337 million in debt was secured by first liens on substantially all of the debtors'

assets.  A first lien lender holding $1 million of the secured debt objected to the sale.

The GWLS court noted that the credit agreement authorized the agent to "exercise such

powers as are delegated to such Agents by the terms hereof and thereof together with such

actions as are reasonably incidental thereto."  Id. at *5.  The GWLS court also noted that the

collateral agreement executed contemporaneously with the credit agreement provided the agent

with the right to "dispose of or deliver the Collateral or any part thereof" and that the agent

thereunder was given "all rights and remedies of a secured party under New York UCC or any

applicable law."  Id. at *5.  Based on those provisions, the GWLS court held that the agent was

authorized by "the clear and unambiguous language" of the agreements to credit bid for its

collateral.  Id. at *6.

Here, ignoring its exceedingly broad and irrevocable delegation of rights to the Agent to

exercise the rights of a secured creditor and to dispose of the Collateral, BDC argues that the

Agent could not credit bid the full amount due under the Credit Agreement.  Specifically, BDC

argues that the text in a separate paragraph of Section 5.01 providing that a Secured party may

bid for the collateral "by using any claim then due and payable to such Secured Party" means

that the Agent may *only* sell so much of the Collateral as is authorized "by discrete secured

creditors bidding their discrete secured debt."  See BDC App. 1279 and 1289 (Security

Agreement §§ 1.02 and 5.01).  BDC is wrong.

First, BDC fails to recognize that it is the Agent that determines "in its sole absolute

discretion" whether to sell the Collateral or any portion thereof.  See BDC App. 1289 (Security

Agreement § 5.01).  Second, the portion of Section 5.01 upon which BDC relies is contained in a separate paragraph of Section 5.01 that deals *only* with sales commenced by the Agent under Section 9-611 of the Uniform Commercial Code ("UCC").  See BDC App. 1289.  By its express terms, Section 5.01 is inapplicable to the sale of the Assets commenced by the Debtors under Section 363 of the Bankruptcy Code.  See In re Metaldyne Corp., 409 B.R. at 679 (holding that portion of Section 5.01 upon which BDC relies concerns only an auction conducted by the Agent pursuant to UCC § 9-611 and is thus "inapplicable to this case.").  BDC does not – and cannot – dispute that the prior paragraph of Section 5.01 authorized the Agent to exercise remedies available to "a secured party under the Uniform Commercial Code *or other applicable law*."  See BDC App. 1279 and 1289 (Security Agreement §§ 1.02 and 5.01) (emphasis added).  In this case, there was no UCC sale.  Instead, the Debtors sold their assets under Section 363 of the Bankruptcy Code.

Third, even if the portion of Section 5.01 upon which BDC relies was applicable, that language also expressly authorized the Agent to credit bid the full amount of the Lenders' debt. As indicated above, Section 5.01 authorizes "any Secured Party" to bid for or purchase the Collateral or any part thereof offered for sale" and to pay for such Collateral "by using any claim then due and payable to such Secured Party."  See BDC App. 1289.  As BDC now admits, the term "Secured Party" specifically includes the Agent.  See Amended Brief of Appellant BDC Finance LLC (the "BDC Opening Brief") at 17 n.9; BDC App. 1279 (Security Agreement § 1.02) ("'Secured Parties' shall mean (a) the Lenders, (b) the Administrative Agent, (c) the

*Collateral Agent . . .*") (emphasis added).[5]  Accordingly, the Agent had a right to credit bid "by using the claim then due and payable to" to the Agent.

BDC's argument that the Agent could not bid the full amount of the Lenders' secured claim is based upon a misunderstanding of what was "due and payable" to the Agent.  As the holder of the lien on the Collateral securing the *full* amount due to the Lenders, the Agent had a claim against the Debtors for the *full* amount due and payable under the Credit Agreement.

The Bankruptcy Code defines "claim" as a "right to payment."  <u>See</u> 11 U.S.C. § 101(5)(A).  The Bankruptcy Code defines a "lien" as a "charge against or interest in property to secure payment of a debt or performance of an obligation."  <u>See</u> 11 U.S.C. § 101(37).  Thus, the Agent's "lien" for the full amount due to the Lenders is a "claim" against the Debtors for that same full amount.  <u>See</u>, <u>e.g.</u>, <u>In re Hernandez</u>**,** 175 B.R. 962, 965 (N.D. Ill. 1994) ("A lien is a claim."); <u>In re Sneijder</u>, 407 B.R. 46, 54 n.9 (S.D.N.Y. 2009) ("a 'lien' is a 'claim'") (citing <u>In re Jiminez</u>, 2008 WL 2026147, at *4 (Bankr. S.D.N.Y. May 9, 2008)).

The Bankruptcy Code defines a "debt" as "liability on a claim."  <u>See</u> 11 U.S.C. § 101(12).  As the Agent held a "claim" against the Debtors for the full amount due to the Lenders, the Debtors owed a "debt" to the Agent in that same amount.  <u>See</u> <u>Pennsylvania Dep't of Public Welfare v. Davenport</u>, 495 U.S. 552, 558 (1990) ("claim" and "debt" are co-extensive); <u>In re Glance</u>, 487 F.3d 317, 321 (6th Cir. 2007) ("If, as <u>Johnson [v. Home State Bank</u>, 501 U.S. 78, 84, 86 (1991)] concludes, a lien is a 'claim against the debtor,' then it follows, under the Code's equivalent treatment of the terms, that a lien is a 'debt' owed by the debtor.").  Therefore,

---

[5] The Agent serves as both the Administrative Agent and the Collateral Agent under the Credit Agreement and Security Agreement.

if the paragraph of Section 5.01 upon which BDC relies is applicable, it also expressly

authorized the Agent to credit bid the full amount due under the Credit Agreement.

Fourth, the Agent's rights and remedies under the Security Agreement are cumulative.

See BDC App. 1928 (Security Agreement § 6.08) (the rights and remedies of the Agent

"hereunder" are "cumulative").  Thus, regardless of the Agent's rights under the second

paragraph of Section 5.01, the Agent had the right under the first paragraph of Section 5.01 "to

sell or otherwise dispose of all or any part of the Collateral."  See BDC App. 1288-89 (Security

Agreement § 5.01).  That is exactly what the Agent did in this case.

BDC's argument that the Agent lacked authority to credit bid the full amount due under

the Credit Agreement is belied by the language of the Security Agreement.  BDC's position is

also unsupported by any case law.

BDC's argument is also inconsistent with the purpose of having an Agent in the context

of multiple lender credit facilities.  The purpose of the Agent's authority to act on behalf of the

Lenders is to empower the Agent to act in the collective interest of the Lenders.  Providing such

authority to a single agent "avoids chaos and prevents a single lender from being preferred over

others."  In re Chrysler LLC, 405 B.R. 84, 104 (Bankr. S.D.N.Y. 2009) (citing In re Enron Corp.,

302 B.R. 463, 475 (Bankr. S.D.N.Y. 2003), aff'd 2005 WL 356985 (S.D.N.Y. Feb. 14, 2005).

Although BDC argues that it is receiving no value in exchange for the Agent's credit bid of

BDC's claim, that is simply untrue.  BDC has the same option to participate in MDI as any other

Prepetition Term Lender.  If BDC does not like that option (or even if it does not get that option),

that is a dispute between BDC and either the Agent or MDI.  That has nothing to do with the fact

that the Agent was authorized *by BDC* to act *on BDC's behalf*.  See In re Metaldyne Corp.,

409 B.R. at 675 ("what BDC is complaining about is fundamentally a dispute with the Agent, the Lenders, and MDI, not with the credit bid itself.").

At bottom, BDC seeks something more than what the other 97% of Lenders are receiving.  BDC seeks to recover part of the consideration paid to the Estates to resolve challenges to the Agent's liens – which were held for the benefit of the Lenders, including BDC.  BDC's argument that funds paid by MDI to resolve challenges to the Agent's liens constitute proceeds of BDC's (i.e., the Agent's) liens makes no sense.  None of the Lenders are receiving those funds.  BDC essentially argues that a settlement payment made by a secured creditor to resolve challenges to the secured creditor's liens somehow are proceeds of such liens and should be distributed back to the secured creditor.

BDC also wants to receive value that other Lenders participating in MDI will receive even though BDC does not want to make whatever payments are required to participate in MDI.  In essence, BDC wants a recovery without paying its fair share of the funds that MDI paid to resolve challenges to the Agent's liens.  In any event, BDC's disputes with MDI and the Agent are irrelevant.  BDC authorized the Agent to credit bid the obligations owed under the Credit Agreement, including BDC's claim.  How the Agent or MDI deal with the Assets is not the concern of the Estates or the Bankruptcy Court.[6]

The Agent acted in accordance with Article VIII of the Credit Agreement and Section 5.01 of the Security Agreement.  The situation here, as the Bankruptcy Court noted, is similar to that involved in <u>Chrysler</u>, where the Second Circuit stated:

---

[6] Once the Agent credit bid for its collateral, the terms upon which Lenders could participate in MDI and share in those assets was beyond the Bankruptcy Court's jurisdiction.  <u>See</u> In re Hall's Motor Transit Co., 889 F.2d 520, 522 (3d Cir. 1989) ("The bankruptcy court's jurisdiction does not follow the property, but rather, it lapses when the property leaves the debtor's estate.").

> the § 363(b) sale was effected by implementing the clear terms of the loan agreements – specifically, the terms by which (1) the lenders assigned an agent to act on their behalf, (2) the agent was empowered, upon request from the majority lenders, to direct the trustee to act, and (3) the trustee was empowered, at the direction of the agent, to sell the collateral in the event of a bankruptcy.

In re Metaldyne Corp., 409 B.R. at 678 (quoting In re Chrysler LLC, 576 F.3d 108, 120 (2d Cir. 2009)); see also In re GWLS Holdings, Inc., 2009 WL 453110, at *5 (Bankr. D. Del. February 23, 2009).

In short, BDC has no legitimate dispute with the Estates or the Sale.  The Agent acted for and on behalf of BDC – and BDC is bound by *its* Agent's consent to the Sale.  In effect, the Agent's consent to the Sale is BDC's consent to the Sale.  BDC's dispute with MDI or the Agent was not a basis to deny entry of the Sale Order.  See Chrysler, 405 B.R. at 103 (fact that dissenting lenders "do not like the outcome is not a basis to ignore the governance provisions of the relevant agreements").

## 2. The Agent's Credit Bid Did Not Effect an Amendment of the Credit Agreement or the Security Agreement.

The Agent's credit bid of the full amount of the obligations under the Credit Agreement satisfied those obligations, thereby resulting in a release of the Agent's liens.  BDC argues that the release of the Agent's liens violated Section 9.02(b) of the Credit Agreement.  See BDC Opening Brief at p. 18.  Again, BDC is wrong.

Section 9.02(b) applies *only* to amendments to the Credit Agreement or the Security Agreement.  Section 9.02(b) is irrelevant because the Sale did not involve any amendment of the Credit Agreement or the Security Agreement.

The GWLS court rejected the exact argument advanced by BDC in this case, holding that the agent's authority to credit bid did not involve any amendment or modification of the loan

documents.  See GWLS, 2009 WL 453110 at *6; see also Beal Sav. Bank v. Sommer, 865

N.E.2d 1210, 1217-18 (N.Y. 2007) (concluding that provisions in a syndicate loan arrangement

requiring unanimous consent by participating lenders in order to amend, modify or waive terms

of related loan agreements did not preclude application of specific provisions which

accomplished the parties' agreed-upon intent for collective action through an agent upon default

by borrower).  Therefore, the Sale did not implicate, let alone violate, Section 9.02(b) of the

Credit Agreement.

### 3.       BDC Does Not Have a Right to Adequate Protection

BDC argues that the Bankruptcy Court should have provided BDC with adequate

protection.  BDC is incorrect.

Section 363(e) of the Bankruptcy Code provides that a court shall provide adequate

protection to "an entity that has an interest in property" sold by a debtor to the extent necessary

to adequately protect that interest.  In this case, pursuant to Section 363(k) the Agent credit bid

the full amount due under the Credit Agreement.  See 11 U.S.C. § 363(k) (secured creditor "may

offset such claim against the purchase price of such property").  As a matter of law, the Agent's

credit bid satisfied or extinguished the entire amount due under the Credit Agreement.  See

McInerney v. Tang, 5 F.3d 537 (Table), 1993 WL 312763, at *2 (9th Cir. Aug. 18, 1993) ("[T]he

Pecks Lane Property had been sold in exchange for a full credit bid.  This extinguished the debt

of the McInerneys to the Goodman defendants.").  Thus, as a result of the Agent's credit bid,

BDC has no claim.  See In re Spillman Dev. Group, Ltd., 401 B.R. 240, 256 (Bankr. W.D.Tex.

2009) ("Because Fire Eagle's $9.3 million credit bid satisfied the underlying debt secured by the

SIG CD, Fire Eagle does not have a valid claim to the SIG CD."); In re Ocean Blue Leasehold

Property LLC, --- B.R. ---, 2009 WL 1117400, at *6 (Bankr. S.D.Fla. Apr. 23, 2009) ("Legg

Mason's claim was extinguished when it credit bid the full value of its claim in connection with its acquisition of the Property from the Chapter 11 Trustee").

BDC's argument, taken to its logical extreme, would require the Bankruptcy Court to provide adequate protection for all of the Lenders even though their claims also no longer exist. As the Bankruptcy Court correctly recognized, "BDC may have been a secured creditor at the outset, but once the Agent, acting on the secured lenders' behalf, releases the liens, BDC loses its status as a secured creditor entitled to adequate protection under § 363(e)."  In re Metaldyne Corp., 409 B.R. at 679 n.11.

Further, BDC contracted away its right to demand adequate protection for itself.  As noted by the Bankruptcy Court, "Article VIII also prevents BDC from demanding adequate protection under § 363(e).  Pursuant to Article VIII, BDC assigned to the Agent its rights and remedies under the Prepetition Term Loan Facility."  In re Metaldyne Corp., 409 B.R. at 679 n.11.

When the Agent credit bid the full amount due under the Credit Agreement, BDC's claim was satisfied in full.  BDC has neither a claim nor a right to adequate protection.

### B.      The Sale Does Not Constitute a *Sub Rosa* Chapter 11 Plan or Violate the Priority Scheme of the Bankruptcy Code.

The Sale was not a *sub rosa* plan.  "The sale of assets is permissible under § 363(b); and it is elementary that the more assets sold that way, the less will be left over for a plan of reorganization, or for liquidation."  In re Chrysler LLC, 576 F.3d at 117 (stating that "a § 363(b) sale may well be a reorganization in effect without being [a *sub rosa* plan].").  Section 363(b) sales are warranted where "'a good business opportunity [is] presently available' which might soon disappear [and] quick action [is] justified in order to increase (or maintain) the value of an asset to the estate, by means of a lease or sale of the assets."  In re Chrysler LLC, 576 F.3d at 114

(quoting <u>Comm. of Equity Sec. Holders v. Lionel Corp.</u> (<u>In re Lionel Corp.</u>), 722 F.2d 1063, 1069 (2d Cir. 1983)).  Thus, if a Section 363 sale "has 'a proper business justification' which has potential to lead toward confirmation of a plan and is not to evade the plan confirmation process, the transaction may be authorized."  <u>In re Chrysler LLC</u>, 405 B.R. at 96 (quoting <u>Motorola v. Comm. of Unsecured Creditors</u> (<u>In re Iridium Operating LLC</u>), 478 F.3d 452, 467 (2d Cir. 2007)).

The Sale was not intended to evade the plan confirmation process nor did the Sale circumvent the need for a chapter 11 plan.  In fact, the Sale and the MDI payments gave the Estates the only funds available to pay administrative claims and proceed with a liquidating plan. The Debtors and the Committee are discussing the terms of a chapter 11 plan involving a liquidating trust for the disposition of the Debtors' remaining assets and the potential pursuit of causes of action.  The Sale provided for the payment of $2.5 million to the liquidating trust upon the effective date of confirmation of a plan.

BDC's argument that "junior" creditors are receiving value at BDC's expense is baseless. First, BDC no longer possesses a claim as a result of the credit bid.  Second, as discussed above, MDI's agreement to pay administrative expense claims and to fund $2.5 million for unsecured creditors did not involve the proceeds of the Agent's liens.  Those payments were made because of objections and challenges to the Agent's liens – not as proceeds of those liens.

**C.      MDI is a Good Faith Purchaser Pursuant to Section 363(m) of the Bankruptcy Code**

The Bankruptcy Court properly found that MDI was a "good faith" purchaser as that term is used in Section 363(m) of the Bankruptcy Code.  <u>See</u> BDC App. 97 (Sale Order, ¶ K).  BDC, however, argues that MDI is not a good faith purchaser because "the good-faith requirement prohibits fraudulent, collusive actions intended to affect the sale price or control the outcome of

the sale."  See BDC Opening Brief at pp. 20-21 (citing 11 U.S.C. § 363(m)).  This argument is baseless.

Section 363(n) of the Bankruptcy Code provides, *inter alia*, that "[t]he trustee may avoid a sale under this section if the sale price was controlled by an agreement among potential bidders at such sale . . . ."  See 11 U.S.C. § 363(n).  The Bankruptcy Code's prohibition on collusive bidding, set forth in Section 363(n), is designed to preclude agreements that *depress* the sale price.  See Boyer v. Gildea, 374 B.R. 645, 661 (N.D. Ind. 2007) (an agreement between bidders that makes higher bids more likely is not objectionable under Section 363(n)).  Although BDC argues that MDI colluded with the Committee, BDC simultaneously argues that the Agent and MDI gave *too much* – not too little – value for the Assets by credit bidding the full amount owing under the Credit Agreement.

The "collusion" prohibited by Section 363(n) refers to "secret cooperation for a fraudulent or deceitful purpose."  Lone Star Indus., Inc. v. Compania Naviera Perez Compancy (In re New York Trap Rock Corp.), 42 F.3d 747, 752 (2d Cir. 1994) (quoting Webster's Third New International Dictionary 446 (G. & C. Merriam Co. 1976 ed.)).  There was nothing secret, fraudulent, or wrongful about the Debtors' and the Committee's negotiations with MDI.  The parties simply resolved legitimate objections and challenges to the Agent's liens by payments from MDI (one of the Lenders) so that the Agent was able to credit bid the full amount due under the Credit Agreement.  The negotiated resolution maximized (and did not depress) the consideration that the Estates received for the Assets.[7]

---

[7] BDC's assertion of an agreement that "affected" the Sale price (by increasing it) is not a sufficient allegation of collusion that "controlled" the Sale price (by reducing it) in violation of Section 363(n).  See In re New York Trap Rock Corp., 42 F.3d at 752.  Furthermore, Section 363(n) prohibits collusion among "potential bidders."  See 11 U.S.C. § 363(n).  The Committee was not a potential bidder.

The record is devoid of evidence that MDI engaged in fraud or collusion or that MDI's conduct throughout the Sale process otherwise lacked integrity.  See In re Gucci, 126 F.3d 380, 390 (2d Cir. 1997) ("good faith," as used in Section 363(m) of the Bankruptcy Code, is shown by the "integrity of [the purchaser's] conduct during the course of the sale proceedings"); Bay Harbour Mgmt., L.C. v. Lehman Bros. Holdings, Inc. (In re Lehman Bros. Holdings, Inc.), 2009 WL 667301, at *6 (S.D.N.Y. March 13, 2009) (generally, a transaction is not in "good faith" where a purchaser engages in fraud or collusion or unfairly takes advantage of other bidders).  Accordingly, there is no basis to overturn the Bankruptcy Court's finding that MDI was a good faith purchaser.  See Fed.R.Bankr.P. 8013 (bankruptcy court's findings of fact, "whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous").

### D.    BDC's Constitutional Rights were Not Violated.

BDC argues that the Sale process (and the Bankruptcy Court's refusal to grant MDI's request for a continuance) violated BDC's due process rights.  BDC is wrong.

First, as indicated above, through its duly-authorized Agent, BDC consented to the Sale. Second, the Auction was conducted in accordance with bidding procedures approved by the Bankruptcy Court as early as June 25, 2009.  See BDC App. 16 (Docket Item No. 314) (Order approving bidding procedures for the Debtors' powertrain assets) and BDC App. 28 (Docket Item No. 396) (Order approving bidding procedures for the Debtors' chassis assets).  BDC did not object to the bidding procedures.

Second, notice of the Debtors' sale of its chassis division was published in the *Wall Street Journal* on July 13, 2009 and in the *Detroit Free Press* on July 12, 2009.  See BDC App. 57 (Docket Item No. 608) (Proof of Publication in Connection with Notice of the Sale of Certain Assets of the Debtors' Powertrain Group).  Notice of the Debtors' sale of its powertrain division

was published in the *Wall Street Journal* on July 29, 2009 and in the *Detroit Free Press* on July

28, 2009.  See BDC App. 57 (Docket Item No. 609) (Proof of Publication in Connection with

Notice of the Sale of Certain Assets of the Debtors' Powertrain Group).

Third, BDC substantially downplays its involvement in the process that led to the Sale.

Weeks before the Auction, BDC was presented with the same materials that were given to all of

the Lenders concerning the constitution of MDI and soliciting their interest.  See BDC App.

1000 (Sale hearing transcript).  In the following exchange, the Bankruptcy Court discredited

statements of BDC's counsel regarding BDC's lack of notice of the Auction or terms of the Sale:

> COUNSEL FOR BDC:  Now, we don't have a record as to what's
> happening here because no one will tell you or me what's in this
> MD Investors' capital structure. . . . Now, happily, we're all here
> on a hurry, we've all been up all night.  The Court, too, evidently,
> reading these documents.  And nobody should have to resolve this
> kind of question on this kind of notice.  And what - -
>
> THE COURT:  Well, you've known about this.  I mean, you filed
> your objection several days ago and you said it was conditional,
> you didn't know whether MD Investors was going to be the
> successful bidder.  So this is not news to you.
>
> COUNSEL FOR BDC:  Well, it's not news as of Monday.
>
> THE COURT:  You've known for some time and you've [been] on
> the outside peeking in.  That may be fine, you may be absolutely
> right about this.  But don't tell me you didn't know about this until
> the middle of the night.
>
> MR. WILLETT:  I mean that we've been reviewing the security
> documents since Monday, that's true.  We didn't have the terms of
> the bid to compare it to until the middle of the night.

BDC App. 1098.  Thus, BDC's constitutional notice argument is, essentially, that BDC did not

have sufficient time to review the final MDI asset purchase agreement because it was not

distributed with the bid procedures.  BDC's argument is illogical:  If all potential bidders' asset

purchase agreements were distributed with the bid procedures, there would be no need for bid procedures.

Fourth, BDC does not indicate what evidence it would have presented (or even sought) if the Sale hearing were continued.  BDC – the holdout among the Lenders – is simply "throwing in everything, including the kitchen sink" in an effort to thwart the Sale so that it can obtain special treatment not afforded to other Lenders.

In its effort to undo the Sale and leverage special treatment not afforded to the other 97% of the Lenders, BDC seeks to disclaim the irrevocable authority that *BDC* conferred on the Agent.  As a matter of law, BDC is bound by its Agent's agreements and actions.  See Chrysler LLC, 576 F.3d at 120 ("minority lenders could not object to the trustee's actions since they had given their authorization in the first place").

## V.   CONCLUSION

For all of the foregoing reasons, the Committee respectfully requests that the Court affirm the Sale Order.

New York, New York
Dated:  October 19, 2009               Respectfully submitted,

**REED SMITH LLP**

By:     /s/ Mark D. Silverschotz
         Mark D. Silverschotz
         599 Lexington Avenue
         22nd Floor
         New York, NY 10022
         Telephone:  (212) 205-6086
         Facsimile:  (212) 521-5450
         Email:  msilverschotz@reedsmith.com

           and

         Kurt F. Gwynne
         Mark W. Eckard
         1201 N. Market Street, Suite 1500
         Wilmington, DE 19801
         Telephone: (302) 778-7500
         Facsimile: (302) 778-7575
         E-mail:  kgwynne@reedsmith.com
               meckard@reedsmith.com

         Counsel for the Official Committee of
         Unsecured Creditors